MASSACHUSETTS NURSES ASSOCIATION *vs.* BOARD OF
REGISTRATION IN NURSING & another.[1]

Suffolk. June 5, 1984. — July 18, 1984.

Present: GREANEY, C.J., CUTTER, & PERRETTA, JJ.

*Administrative Law,* Regulations. *Board of Registration in Nursing. Nurse.*

The requirement of G. L. c. 112, § 74, that the Board of Registration in
Nursing establish a "procedure for the approval of programs" of continu-
ing education of nurses did not mandate advance approval of programs
by the Board, but was satisfied by the Board's adoption of regulations
giving detailed substantive guidelines respecting appropriate educational
programs, providing for verification on a random basis of programs
offered, and establishing a procedure for dealing with complaints con-
cerning the quality of programs. [384-389]

Publication in the Massachusetts Register of certain regulations of the Board
of Registration in Nursing before the regulations were filed with the
Joint Legislative Committee on Health Care did not deprive the commit-
tee of the opportunity to review and comment on the regulations since
the regulations did not take effect for more than thirty days after their
submission to the committee. [389-390]

The fact that not all the seats on the Advisory Council on Continuing Educa-
tion were filled when the council made certain recommendations to the
Board of Registration in Nursing concerning regulations on continuing
education for nurses did not render invalid regulations subsequently
adopted by the Board pursuant to such recommendations. [390]


CIVIL ACTION commenced in the Superior Court Department
on November 16, 1981.

The case was heard by *John Paul Sullivan,* J., on a motion
for summary judgment.

*Kathryn M. Noonan* for the plaintiff.

*Stephen S. Ostrach,* Assistant Attorney General, for the
defendants.

---

[1] The Secretary of the Commonwealth.

GREANEY, C.J. We must decide whether, as claimed by the Massachusetts Nurses Association (MNA), certain regulations of the Board of Registration in Nursing (board) seeking to carry out legislative directives for the continuing education of nurses are invalid. We conclude, as did a judge of the Superior Court, that they are valid and affirm the judgment which so declares.

The material facts have been developed in the context of MNA's motion for summary judgment, Mass.R.Civ.P. 56(a), 365 Mass. 824 (1974), and are undisputed. By St. 1977, c. 884, § 1, the Legislature amended G. L. c. 112, § 74, to require the board to promulgate rules and regulations for the continuing education of nurses.[2] Pursuant to the statute, the board, in March, 1980, adopted regulations which delegated the prior approval of all continuing education programs to the MNA and two other nursing organizations.[3] Questions soon arose whether the board's wholesale delegation of its approval power was lawful and whether the delegation involved possible violations of G. L. c. 268A, governing the conduct of public officials and employees.[4] After inquiry, opinions were con-

---

[2] The pertinent parts of G. L. c. 112, § 74, as amended through St. 1983, c. 714, § 2, remain the same as the statute in existence in 1977 and provide as follows: "The board shall promulgate rules and regulations . . . as to [1] the type and amount of continuing education required for [a] nurse as a qualification for licensing or relicensing, [2] criteria for approved programs, *which shall not exclude programs offered by health care facilities licensed by the department of public health or educational institutions chartered by the commonwealth,* [3] procedure for the approval of programs, [4] mechanism for the verification of compliance by each person seeking renewal or registration and provision for inactive status. The board shall have the authority from time to time to make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of the continuing education requirements; provided, however, that no such rule or regulation shall take effect before the thirtieth day following the date when a copy of the rule or regulation is filed with the joint legislative committee on health care of the general court." The bracketed numbers and emphasized language are supplied for reference in later discussion. The primary focus of the appeal is on [3], the adoption by the board of a "procedure for the approval of programs."

[3] Licensed Practical Nurses of Massachusetts, Inc., and the Massachusetts/ Rhode Island League of Nursing.

[4] The potential problems with G. L. c. 268A centered on MNA charging a fee for the review and approval of programs. In 1981, MNA received

veyed to the board by the general counsel of the Executive Office of Community Affairs (EOCA) and by the State Ethics Commission disapproving of the board's procedure.[5]

The Advisory Council on Continuing Education, see G. L. c. 112, § 74C, considered these problems with the original regulations and recommended revised regulations by which approval would not be delegated to organizations.[6] These recommended regulations are, in substance, those under consideration in this appeal. The board made certain changes and then circulated the proposed regulations to interested groups, including the MNA. On August 18, 1981, the board held a public hearing and received testimony on the regulations from individual nurses as well as representatives of hospitals, schools, commercial vendors, and professional nursing organizations. At 244 Code Mass. Regs. § 5.04 (1981) the board established "Criteria for Qualification of Continuing Education Programs/Offerings," and at § 5.05 (1981) it established "Responsibility of Individual Licensee."[7] MNA filed a complaint

$30,200 in fees for its approval of programs. In addition, MNA sponsored or co-sponsored continuing education programs.

[5] The general counsel of EOCA expressed the views that the authority conferred on the board by the Legislature could not be delegated and that MNA's participation in the approval of programs would violate the State conflict of interest law because MNA personnel would become State employees with a financial interest in an arrangement or agreement with a State agency.

The State Ethics Commission concluded that participation by employees of the nursing associations in continuing education approval procedures would violate the State conflict of interest law and the Code of Conduct for State employees.

[6] These recommendations by the Advisory Council were made pursuant to the express directives of G. L. c. 112, § 74C, inserted by St. 1977, c. 884, § 3. (Section 4 of the inserting act provided in part: "The advisory council on continuing education . . . shall study procedures and requirements for continuing education for nurses and submit recommendations to the board.") The council is composed of fourteen nurses among its seventeen members. See G. L. c. 112, § 74C. The council had also submitted recommendations for the original regulations pursuant to the requirements of § 4 of St. 1977, c. 884.

[7] Regulation 5.04, containing the criteria for the approval of programs, is voluminous and will not be reproduced in this opinion. Regulation 5.05,

in the Superior Court seeking a declaration under G. L. c. 231A that the regulations are invalid.[8] The board's motion to dismiss, alleging that MNA lacked standing to challenge the regulations, was denied. On MNA's motion for summary judgment, the judge concluded that MNA had standing to seek judicial review and entered a judgment in the board's favor declaring that "[t]he regulations of the Board of Registration in Nursing pertaining to the continuing education of nurses, codified at 244 CMR 5.00 et seq. are lawful and in accordance with the requirements of G. L. c. 112, §§ 74 and 74A, and are neither arbitrary nor capricious nor unreasonable."

MNA argues that the board has failed to establish a "procedure for the approval of programs" as directed by the third requirement in G. L. c. 112, § 74, see note 2, *supra.*[9] Without such a procedure, MNA concludes that the regulations are invalid on their face. The board contends, on the other hand,

which is directly challenged on this appeal, reads as follows: "*5.05: Responsibility of Individual Licensee.*

"It is the responsibility of each nurse to maintain an authenticated record of continuing education offerings completed, and to submit evidence of the required number of contact hours for that specific biennium upon request of the Board. These records should be maintained for two consecutive bienniums.

"(1) Application for licensure renewal shall be signed under the pains and penalties of perjury.

"(2) The Board shall verify on a random basis continuing education offerings. The licensed nurse requested to submit evidence of qualifying courses will submit a statement (or xerox) copy including the following: (a) name of school, institution or organization conducting the course; (b) location of course; (c) title of course; (d) dates attended; (e) hours claimed; (f) name (or signature) of authorizing individual.

"(3) Nurses licensed by endorsement shall meet the continuing education requirements for the current biennium.

"(4) New licensees shall not be required to submit evidence of continuing education for the first renewal period."

[8] The Licensed Practical Nurses Association, Inc., intervened in MNA's action as a plaintiff and participated thereafter in the prosecution of the action. It has not appealed, however, from the judgment, and need not be considered further.

[9] MNA contends that the obligation to approve programs can only be accomplished by means of a procedure whereby each continuing education program is approved in advance of the program's being offered to nurses.

that it has a procedure for the approval of programs which derives from (1) § 5.04, which provides detailed substantive guidelines to assist nurses in selecting, and providers in designing and carrying out, appropriate educational programs, (2) § 5.05(2), which provides for verification on a random basis of continuing education offerings, and (3) a procedure for dealing with complaints concerning the quality of providers' programs. The narrow legal issue before us,[10] therefore, is whether, in light of the standards governing the adoption of regulations by an administrative agency entrusted with enforcing a statute, there is enough in the board's approach to the approval of programs to satisfy the Legislature's directives.[11]

1. By enacting c. 112, § 74, the Legislature decided, in furtherance of the public welfare, that nurses, as a condition of relicensure, should maintain or improve their health care skills by continuing their education. The Legislature left administration of the statute to the board, not to the courts, and outlined, in furtherance of the general statutory goal, four areas (see note 2, *supra*) for the board to address by rule or regulation. While the Legislature's identification of these areas limited the board's discretion in some respects, there is — on the issue which we are concerned with — nothing in the words of the statute which requires that the board adopt a procedure for conferring *prior* approval on all continuing education programs.[12] See *Boylston Water Dist.* v. *Tahanto Reg. Sch.*

_____

[10] In our view, the second and fourth requirements of G. L. c. 112, § 74, see note 2, *supra,* are clearly met by §§ 5.04 and 5.05, which establish criteria for the approval of programs and a mechanism for verification of compliance by nurses with their continuing education obligations.

[11] Since we agree with the judge that the MNA has failed to show that the board's regulations are invalid, we assume (without deciding) that the judge correctly decided that MNA had standing to seek judicial review. We note that the resolution of the standing issue would depend in part on whether MNA has a conflict of interest with its members so as to preclude MNA from representing their interests. See *Massachusetts Elec. Co.* v. *Massachusetts Commn. Against Discrimination,* 375 Mass. 160, 178-179 (1978).

[12] Furthermore, when the revised regulations were submitted for review to the Joint Legislative Committee on Health Care, as required by c. 112, § 74, that committee made no recommendation that the board adopt a procedure for the prior approval of programs.

*Dist.*, 353 Mass. 81, 83-84 (1967); *Beeler* v. *Downey,* 387
Mass. 609, 617 (1982). Indeed, the legal concept of "approval"
goes beyond the notion of approval in advance and encompasses
ratification or confirmation of prior conduct and decisions. See
Black's Law Dictionary 94, 1135 (5th ed. 1979). We think
the legislative grant, despite the enumeration of specific areas
to be covered by regulation, confers on the board a reasonable
range of discretion concerning "how to carry out a [relatively]
new legislative program with reasonable flexibility and in an
orderly [and lawful] manner, giving suitable weight to the
personnel and resources available to the agency." [13] See *Brooks*
v. *Architectural Barriers Bd.*, 14 Mass. App. Ct. 584, 588-589
(1982), and cases cited.

Pursuant to the statute, the board, in §§ 5.04 and 5.05: (1)
sets forth standards which must be satisfied by an individual
nurse to complete satisfactorily the continuing education re-
quirement; (2) requires each nurse to select courses pursuant
to a series of very specific guidelines which articulate, among
other things, the types of acceptable programs (see § 5.04[2]),
the amount of instruction required (see § 5.04[1]), and other
criteria for the evaluation of programs; (3) delineates for pro-
viders in considerable detail what is to be contained in a suitable
program; (4) provides for the selective random audit of educa-
tion programs (§ 5.05[2]); and (5) requires that providers of

---

[13] The board has extremely limited resources. Its staff, as of May, 1983,
consisted of three professional and five clerical personnel. There are approx-
imately 75,000 registered nurses and 35,000 licensed practical nurses who
are subject to the board's jurisdiction. The board's staff, among other duties,
must administer licensing exams four times a year and compile the results;
issue certified statements when nurses apply for a license in another State
(approximately 270 requests per month); issue licenses through endorsement
(approximately 150 requests per month); renew licenses (approximately
1,400 per week for registered nurses, 500 per week for licensed practical
nurses); assist the seventy-six nursing schools throughout the State in cur-
riculum proposals and other programs; process complaints; and provide
staff support to five advisory groups or councils. In 1981 over 1,400 con-
tinuing education courses were approved for offering to nurses. The board's
budget is set by the Legislature and did not contain funds for the hiring of
additional personnel to meet the extra burdens which would flow from a
requirement that each continuing education program be considered and
approved in advance.

programs retain complete records of any program for a period of four years (§ 5.04[2][g]). Moreover, the board makes itself available to investigate complaints about the quality of programs. The board's regulations appear to be largely designed to encourage the development of programs by new providers since the statute expressly makes provision for programs offered by licensed health care facilities and accredited educational institutions.[14] We suspect that the latter two groups of facilities (and in particular the teaching hospitals and seventy-six schools that have nursing programs), see emphasized language in note 2, *supra,* provide a large number of programs and courses from which nurses can choose offerings appropriate to their specialties and interests.

The board reasonably could have recognized the inherent difficulty and impracticality in approving in advance the great number of programs made available to nurses.[15] Having in

---

[14] An uncontested affidavit of the board's executive secretary reveals that, since prior approval of courses is no longer required, there has been growth in the number of new continuing education programs being developed and offered by new providers particularly "in western Massachusetts . . . where in the past there have been far fewer continuing education options than in the eastern part of the state." This affidavit also observes that "[w]hen local agencies can arrange their own courses, and do not have to pay a fee for prior approval, they can save money and can creatively design programs tailored closely to the interests and needs of local nurses, and drawing on local resources. More varied and local continuing education programs are a better use of nurses' limited money, and are less disruptive of patient care because nurses do not have to travel as far to take courses of their choice."

[15] The affidavit of the board's executive director makes the following observations with respect to considerations which the board reasonably could have taken into account. "First, not all 'approved' programs [are] in fact 'quality' programs. However, given the great variety of nurses' backgrounds, training and experience, a program entirely satisfactory to one may be a disappointment to another. Second, even assuming there were some way to guarantee quality in a continuing education offering, there is no way to guarantee that an individual nurse/participant actually learns anything from the course: the certificate issued to the nurse attests to successful attendance, not necessarily successful learning. Third, while in the aggregate and over time, it is highly probable that there is a positive correlation between nurses' continuing education and improved patient care, nursing is an inexact science, and it is not possible in any given case to measure and prove such a relationship. There is no baseline assessment of

mind the board's limited resources, see note 13, *supra,* the fact that delegation of some or all of the board's authority to approve courses, on court challenge, might be found unlawful, and the likely existence of a considerable number of programs satisfying the regulatory criteria which are presently available through licensed health care facilities and accredited educational institutions, it is reasonable to assume that individual nurses, as consumers of the service of continuing education as well as professionals, are fully capable of employing the board's criteria to select appropriate courses to satisfy continuing education obligations.[16] There is nothing to preclude nurses from consulting with the board's staff prior to registering for a program to ascertain whether the program would satisfy their obligation.

Within this general framework, in the absence of objection to the revised regulations from the Joint Legislative Health Committee, and in view of the advice of the Advisory Council on Continuing Education and the information received at the public hearing, it was within the board's discretion to have determined that a procedure for the systematic random audit of programs would provide reasonable assurances that acceptable programs were being offered. This random audit process puts providers on notice that their continuing education programs may be reviewed.[17] First, the providers are required to

what nursing care is actually given to a patient, against which care given after a nurse takes continuing education may be compared." These considerations are consistent with a proper effort to carry out the legislative intent.

[16] The record indicates that many individual nurses· at the public hearing on the revised regulations supported the concept of allowing nurses as professionals to choose for themselves the programs which best meet their needs without necessarily being confined to lists of courses approved by third parties.

The record further indicates that, at the public hearing on the revised regulations, representatives from a number of schools, hospitals, nursing homes, commercial vendors and nursing organizations other than MNA indicated that they were paying high costs to prepare and deliver educational programs and that they objected to paying the additional costs that would be incurred by outside organizations for the advance approval of programs.

[17] Providers may also have their programs reviewed under the complaint procedure. According to the affidavit of the board's executive secretary

keep records of course offerings for a four-year period (see § 5.04[g]), the same time period that nurses are required to keep records of qualifying courses completed (see § 5.05). Second, as part of the audit process, the board requires that nurses submit appropriate documentation about continuing education courses including, among other things, the name of the school, institution, or organization conducting the course, the location of the course, the title of the course, the dates attended, the hours claimed, and the name (or signature) of any authorizing individual involved (see § 5.05[2][a] through [f]). Third, the regulations inform providers (as well as nurses) of the necessary criteria for continuing education programs (see § 5.04). Thus, the board's regulations (those which involve nurses in the initial stages of selecting programs, specify explicit criteria to guide providers as to what courses to offer and nurses as to what courses to take, and provide a retroactive audit procedure), taken as a whole and considered with the ability of nurses and providers to consult with the board in advance about the suitability of programs, fulfil the statutory requirement of a "procedure for the approval of programs."

The board's procedure doubtless could be improved. It may not be as comprehensive as one which would have furnished prior approval to all programs (even if such an approach could be feasibly accomplished), and it may, in the cases of some nurses, be difficult or unfair in its application. Problems in application, however, are outside the purview of the MNA's

---

the complaint process is tied to §§ 5.04 and 5.05 and works as follows: "Complainants are requested to put formal complaints in writing; the complaint is docketed, and the provider is notified as to the complaint; the matter is investigated, and an informal conference held, which frequently results in clarification or a resolution satisfactory to all parties. Providers of continuing education programs are required by the regulations (both original and revised) to maintain defined standards, to issue statements of successful completion of the program/offering, and to maintain records of attendees and the content, objectives, faculty, teaching materials, evaluation tools, and the like. The Board will use the guidelines in 244 C.M.R. § 5.04 when investigating complaints about the quality of continuing education programs."

present attack on the facial validity of the regulations.[18] Giving consideration to the heavy burden which must be met by a litigant attacking the validity of regulations, see *Rock* v. *Massachusetts Commn. Against Discrimination,* 384 Mass. 198, 206 (1981), the standards governing that question,[19] and the principle that a regulation is not invalid merely because a litigant contends "that the 'ultimate efficacy' of achieving the statutory purpose is in question, or that the means to achieve the statutory end is rough, illogical or not the best available," *Shell Oil Co.* v. *Revere,* 383 Mass. 682, 687 (1981), we conclude that the board has reasonably complied with the statutory mandate.[20]

2. MNA also makes two challenges to the validity of the regulations on procedural grounds, both of which can be dealt with summarily.

(a) No prejudice has resulted from the board's publication of the revised regulations in the Massachusetts Register prior to their filing with the Joint Legislative Committee on Health Care, since the regulations did not take effect for more than thirty days after their submission to the committee. See *Massachusetts State Pharmaceutical Assn.* v. *Rate Setting Commn.,* 387 Mass. 122, 129 (1982). The committee was afforded the

---

[18] MNA is concerned that a nurse who in good faith completes a program which is later disapproved will lose her license to practice nursing. The board replies that it has not yet suspended or revoked any nurse's license for failure to meet the statutory and regulatory requirements. In any event, MNA's concerns are directed to the effects of the regulations in operation, a question different from the one before us, which concerns the validity of the regulations on their face. See *American Family Life Assur. Co.* v. *Commissioner of Ins.,* 388 Mass. 468, 476-477, cert. denied sub nom. *American Family Life Assur. Co.* v. *Hiam,* 464 U.S. 850 (1983).

[19] The courts will "test . . . regulations by the same standard[s] which . . . apply to a statute" and will indulge "all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977).

[20] Since the regulations conform to the dictates of the statute and are in furtherance of the achievement of the statutory goals they are not arbitrary or capricious on their face. See *American Family Life Assur. Co.* v. *Commissioner of Ins.,* 388 Mass. at 476-477.

opportunity to review and comment on the regulations, thereby fully discharging the obligation imposed on it by G. L. c. 112, § 74.

(b) The Advisory Council on Continuing Education made the initial recommendations to the board to revise the regulations pursuant to G. L. c. 112, § 74C. We see no merit in MNA's argument that, since all the seats on the council were not filled at the time of these recommendations, the regulations are invalid. There is nothing in § 74C which requires that the council formally approve the regulations and that statute does not require that the board consult with any specific number of council members before adopting regulations.

*Judgment affirmed.*