LAURA BERRIOS & another[1] *vs.* DEPARTMENT OF PUBLIC WELFARE.

Hampden. December 5, 1991. - January 9, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & GREANEY, JJ.

*Housing Court*, Jurisdiction. *Jurisdiction*, Housing Court. *Housing. Administrative Law*, Regulations, Emergency regulations. *Regulation. Injunction. Public Welfare.*

The Housing Court had jurisdiction to adjudicate claims challenging the adoption and implementation, pursuant to G.L. c. 30A, § 3, fifth par., of emergency regulations of the Department of Public Welfare eliminating various benefits designed to address the needs of homeless families. [591-593]

The Department of Public Welfare had an adequate basis for treating certain budgetary legislation as creating an emergency, warranting its adoption, pursuant to G. L. c. 30A § 3, fifth par., of regulations eliminating various public assistance benefits. [594-595]

Plaintiffs challenging the adoption and implementation of certain emergency regulations of the Department of Public Welfare, which eliminated various benefits designed to address the needs of homeless families, did not demonstrate their entitlement to prelimininary injunctive relief, where the regulations were reasonably consistent with the changes mandated by budgetary legislation. [595-598]

CIVIL ACTION commenced in the Hampden County Division of the Housing Court Department on September 16, 1991.

A motion for preliminary injunctive relief was heard by *William H. Abrashkin*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Faye B. Rachlin* for the plaintiffs.

[1]Ana Cordero.

*Mary C. Connaughton*, Assistant Attorney General, for the defendant.

GREANEY, J. The plaintiffs, both homeless persons, on behalf of themselves and others similarly situated, brought an action in the Hampden County Division of the Housing Court Department, challenging the actions of the Department of Public Welfare (department) in adopting and implementing, pursuant to G. L. c. 30A, § 3, fifth par. (1990 ed.),[2] emergency regulations effective August 1, 1991, which eliminated certain emergency assistance (EA) benefits principally designed to address the needs of homeless families. The benefits eliminated included: security deposit guarantees; moving expenses; furniture storage; costs of transportation necessary to get to an emergency shelter, to search for permanent housing, and other purposes; child care allowances; nutrition allowances; payment of public or subsidized housing rent arrearages and damages claims; and disaster benefits. The statutory authorization for the general EA program is contained in G. L. c. 18, § 2 (D) (1990 ed.), which directs the department to adopt regulations, among other things, to prevent loss of housing and utility shutoffs, to provide home heating assistance, and to prevent homelessness.[3] The bene-

---

[2]General Laws c. 30A, § 3, provides requirements for an administrative agency's adoption of regulations and in the fifth paragraph thereof makes provision for the adoption of emergency regulations as follows:

"If the agency finds that the immediate adoption, amendment or repeal of a regulation is necessary for the preservation of the public health, safety or general welfare, and that observance of the requirements of notice and affording interested persons an opportunity to present data, views, or arguments would be contrary to the public interest, the agency may dispense with such requirements and adopt, amend or repeal the regulation as an emergency regulation. The agency's finding and a brief statement of the reasons for its finding shall be incorporated in the emergency regulation as filed with the state secretary under section five. An emergency regulation shall not remain in effect for longer than three months unless, during that time, the agency gives notice and affords interested persons an opportunity to present data, views or arguments as required in this section, and files notice of compliance with the state secretary."

[3]This statute reads, in pertinent part, as follows:

"(D) The department shall administer a program of emergency assistance to needy families with children and pregnant women with

fits described above were provided for in 106 Code Mass. Regs. §§ 309.010 et seq.

The department's emergency regulations were adopted in response to the Commonwealth's fiscal year 1992 budget, St. 1991, c. 138, § 2, line item 4403-2100 (line item), which appropriated $39,595,475 for the EA program (which had been funded in the amount of $62,734,225 in fiscal year 1991), and provided in connection with the reduced appropriation that "no advance payments shall be paid in fiscal year [1992 as part of EA benefits and] that no funds shall be expended

---

no other children, subject to and in accordance with the provisions of the Social Security Act of 1935, as defined in 42 USC 606(e), to provide benefits to avoid destitution or to provide living arrangements in a home. The commonwealth shall accept matching funds from the appropriate federal authorities for said program.

"Said program of emergency assistance shall assist eligible families to prevent destitution or to provide living arrangements in the home.

"The department shall promulgate rules and regulations to establish the levels of benefits available under the program and to ensure simplicity of administration in the best interest of needy recipients. Such benefits shall include, but not be limited to, the following: —

"(a) for the prevention of the loss of housing, the actual liability up to three times the monthly rental or mortgage liability;

"(b) for the prevention of utility shutoffs or for the resumption of utility services, up to three months of the actual service liabilities;

"(c) for the provision of home heating assistance, up to three months of the actual fuel liabilities.

"The department shall promulgate regulations which would authorize the department to make payments for a fourth month of rent, utility or fuel arrearages if the commissioner certifies in writing that the family would otherwise become homeless, or be without utilities or fuel.

"(d) for the prevention of homelessness, temporary shelter as necessary to alleviate homelessness when such family has no feasible alternative housing available, up to the maximum period subject to federal reimbursement; storage of furniture for up to thirty days; moving expenses of up to one hundred and fifty dollars; advance rent payment of one month's rent; and security deposit not to exceed one month's rent."

for costs not directly attributable to rent or mortgage liability, utilities, and shelter . . . ."[4]

In their action, the plaintiffs alleged that the department had improperly adopted the regulations as emergency regulations pursuant to G. L. c. 30A, § 3, fifth par., see note 2, *supra*, without prior notice and an opportunity for interested persons to be heard, in the mistaken belief that it was required by the budget legislation to eliminate certain EA benefits.[5] The plaintiffs also alleged that, by adopting the emergency regulations, the department had violated the statutory mandate established by G. L. c. 18, § 2 (D), to provide designated benefits as part of the EA program and had eliminated benefits which the Legislature had not intended to cut. The plaintiffs sought certification of a class action, a declaration under G. L. c. 231A (1990 ed.) that the department's emergency regulations were invalid, and preliminary and permanent injunctive relief requiring the department to reinstate the benefits that had been eliminated.

A judge of the Housing Court granted the plaintiffs' request for a preliminary injunction and ordered the department not to implement or enforce the new regulations without first complying with the notice and hearing provisions of G. L. c. 30A, § 3. The judge ruled, among other things: (1) that the Housing Court had subject matter jurisdiction over the dispute; (2) that the plaintiffs had demonstrated a likelihood of success on the merits of their claim that the regulations were not properly adopted as emergency regulations; (3) that the plaintiffs would be irreparably harmed if denied

---

[4]According to the plaintiffs' memorandum in support of their request for a preliminary injunction, the Governor further reduced the appropriation to $19,000,048 pursuant to his line item veto power.

[5]In adopting the emergency regulations, the department stated the following as the nature of the emergency:

"The changes [in existing regulations] are mandated by the Commonwealth's budget for FY 1992, c. 138 of the Acts and Resolves of 1991, and are not matters subject to . . . agency discretion. Delayed implementation of the regulations would delay expenditure reductions that are necessary."

EA benefits; and (4) that the balance of harms weighed in favor of the plaintiffs.[6]

The department sought relief from the judge's orders from a single justice of the Appeals Court pursuant to G. L. c. 231, § 118, first par. (1990 ed.). The single justice treated the petition as an appeal under § 118, second par., and ordered the appeal heard by a panel of the Appeals Court on an expedited basis. We transferred the case to this court on our own motion. On December 10, 1991, we issued an order vacating the preliminary injunction entered in the Housing Court and indicated that an opinion or opinions would follow explaining that order. This is the opinion called for by the order.

1. *Jurisdiction.* We reject the department's argument that the Housing Court lacked subject matter jurisdiction. General Laws c. 185C, § 3, as amended by St. 1979, c. 72, § 3, grants the Housing Court jurisdiction to adjudicate "civil actions arising . . . under the provisions of common law and of equity and any other general or special law, ordinance, by-law, rule or regulation as is concerned directly or indirectly with the health, safety, or welfare, of any occupant of any

---

[6]Following the judge's ruling and order finding that the department had improperly adopted emergency regulations, the department completed the procedures required under G. L. c. 30A, § 3, for transforming the emergency regulations into permanent regulations, and then moved to modify or vacate the injunction on the ground that the question of the propriety of the emergency regulations had become moot. The judge denied the motion, concluding that the department had done nothing more than attempt retroactively to ratify the improperly adopted emergency regulations. The judge stated that such an attempt contravened his order that the department begin the process of promulgating permanent regulations "afresh," in the usual, nonemergency manner. The judge modified the injunction slightly, to make explicit that the regulations as in effect prior to August 1, 1991, would remain in effect until the department followed and completed the usual, nonemergency process for adopting regulations. As discussed below, because we conclude that the regulations were properly issued as emergency regulations, we need not reach the question whether improperly adopted emergency regulations can become permanent through the process designed to transform proper emergency regulations into permanent regulations.

place used, or intended for use, as a place of human habitation . . . ."

This dispute, concerning G. L. c. 18, § 2 (D), and regulations implementing the EA program, clearly falls within the language of G. L. c. 185C, § 3. An emergency shelter is a place used for human habitation,[7] and the plaintiffs are occupants of a shelter. As the judge stated: "Regulations immediately influencing whether [shelter] occupants can obtain permanent housing, public and subsidized housing units, and household furnishings and equipment, and directly affecting their living conditions while in the emergency shelter, are regulations concerned directly rather than indirectly with the health, safety, or welfare of such persons, not in a generalized sense, but in a housing-specific sense." We think the judge was correct in this observation. Additionally, the statute before the court is concerned with such matters as "the prevention of homelessness," "temporary shelter," "advance rent payments," and "[tenant] security deposits." See notes 3 and 4, *supra*. See also *Tedford* v. *Massachusetts Hous. Fin. Agency*, 390 Mass. 688, 693 n.7 (1984) (housing court has jurisdiction over statute providing public financing to relieve a shortage of housing). Likewise, the regulations in issue are largely framed in housing terms.

The judge properly determined that the nexus between housing and the issues in this case is far more immediate than that involved in cases in which the Housing Court has been found to lack jurisdiction, such as a products liability action, *LeBlanc* v. *Sherwin Williams Co.*, 406 Mass. 888 (1990); the fraudulent conveyance of assets, *Ryan* v. *Kehoe*, 408 Mass. 636, 640 (1990); and the operation of a trash transfer station that affects tenants as well as others in the vicinity, *Boston* v. *Kouns*, 22 Mass. App. Ct. 506, 511 (1986). And as he also noted, the Housing Court is empowered, as to cases within its jurisdiction, to grant declaratory

---

[7]Emergency shelters such as those involved in this case have been characterized as "transient housing." *Massachusetts Coalition for the Homeless* v. *Secretary of Human Servs.*, 400 Mass. 806, 822 (1987).

judgments and to adjudicate claims related to procedures required by G. L. c. 30A. See *Tedford* v. *Massachusetts Hous. Fin. Agency, supra.*[8]

2. *Merits.* In dealing with the plaintiffs' application for a preliminary injunction, the judge recognized that both the department's finding of an emergency and the emergency regulations themselves were presumptively valid. See *American Grain Prods. Processing Inst.* v. *Department of Pub. Health,* 392 Mass. 309, 323 (1984). However, looking to Federal decisions cited by the plaintiffs, the judge considered it likely that the plaintiffs could overcome the presumption, considering the careful scrutiny applied in those decisions to a finding by an agency of an emergency sufficient to dispense with notice and comment prior to the promulgation of regulations. See, e.g., *Buschmann* v. *Schweiker,* 676 F.2d 352, 355-356 (9th Cir. 1982). Consistent with this approach, the judge ruled that department funding problems caused by the line item by themselves were inadequate justification for the promulgation of emergency regulations pursuant to G. L. c. 30A, § 3, fifth par. The judge also reasoned that the emergency regulations did not sensibly address the funding problem because the cost of maintaining the plaintiffs in temporary shelter (as required by the new regulations) was higher than the cost of housing the plaintiffs in apartments. The judge concluded that the plaintiffs had demonstrated that implementation of the emergency regulations should be enjoined.

The case is more appropriately analyzed, in our view, by considering the Legislature's intent with regard to the line

---

[8]It was represented at oral argument that, subsequent to the entry of the preliminary injunction, the Chief Administrative Justice issued an order transferring the case and the judge to the Superior Court. See *LeBlanc* v. *Sherwin Williams Co., supra* at 897 n.10, and cases cited. Consistent with this order, the case will remain in the Superior Court, but we think it important to resolve the basic jurisdictional issue to indicate that the preliminary injunction was lawfully entered in the Housing Court without regard to the effect of the order of transfer.

item and the department's role as the agency charged with carrying out the legislative program.

There can be no doubt that the line item significantly narrowed the focus of the EA program compared with benefits available in prior years. The line item expressly provides that "no advance payments shall be paid" in fiscal year 1992, and further provides that payments are to be made *only* for costs "directly attributable to rent or mortgage liability, utilities and shelter." Consistent with this narrowed focus, the Legislature drastically cut the budget of the EA program by over 35%. It was apparent, therefore, that the line item reflected the Legislature's intention to eliminate many benefits previously available under existing regulations.

Faced with the language of the line item, and the large cut in funding for the EA program, the department set about to deal with what we think it properly considered a legislative mandate to reduce substantially EA entitlements. The department reasoned that many existing entitlements under G. L. c. 18, § 2 (D) (*d*), and regulations previously in force, had been effectively superseded, and that its discretion to administer the program had been correspondingly narrowed. Thus, the department adopted emergency regulations in which it sought to adhere closely to the directives of the line item.

Given the circumstances, we conclude that the department was justified in adopting the emergency regulations. "The standard for deciding whether an agency's finding of an emergency under c. 30A was warranted is whether there was a 'substantial basis' for it." *American Grain Prods. Processing Inst.* v. *Department of Pub. Health*, supra at 323. See also *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n*, 350 Mass. 1, 10 (1965). "Such a finding 'is given every presumption in its favor and is not subject to question in judicial proceedings unless palpably wrong.'" *American Grain Prods. Processing Inst.*, *supra*, quoting *Robinson* v. *Secretary of Admin.*, 12 Mass. App. Ct. 441, 450 (1981). The department's view of the line item as creating an emergency is not "palpably wrong" or without sub-

stantial basis. A broad program of assistance had been considerably curtailed, and new language established the scope of the reduced program. The department was not at liberty to continue spending at old levels. Thus, this is not a case where the emergency findings were "unwarrantably made" and directed to "improper denial of public hearings or comment on regulations, to evasion of the salutary purposes of c. 30A and possibly to other serious abuse." *Pioneer Liquor Mart, Inc.* v. *Alcoholic Beverages Control Comm'n, supra* at 9. The judge's conclusion that an emergency had not been adequately shown, so as to justify immediate department action under G. L. c. 30A, § 3, fifth par., was erroneous.

We turn to the question whether the plaintiffs have made a strong showing that the emergency regulations are substantively invalid.[9] This question is to be examined in light of established principles of administrative law. "A state administrative agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing." A. Cella, Administrative Law and Practice § 747 (1986). See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977); *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 334 (1964); *Massachusetts Nurses Ass'n* v. *Board of Registration in Nursing*, 18 Mass. App. Ct. 380, 389 (1984). Regulations properly adopted by an administrative agency stand on the same footing as statutes and all rational presumptions are to be made in favor of their validity. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293 (1979). *Massachusetts Nurses Ass'n, supra.* Such regulations are not to be declared void unless their provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate, *Massachusetts Nurses Ass'n, supra* at 389

---

[9]The judge did not consider this question based on his conclusion that the plaintiffs had shown enough in their arguments pertaining to the basis for the adoption of the emergency regulations to justify the grant of a preliminary injunction. The parties have argued the question of the substantive validity of the regulations, and we think examination of it is necessary to ascertain whether the regulations are so inconsistent with legislative authorization as to warrant preliminary injunctive relief.

n.19, and enforcement of such regulations should be refused only if they are plainly in excess of legislative power. *Druzik v. Board of Health of Haverhill*, 324 Mass. 129 (1949).

The language of the line item (combined with the substantial reduction in funding accompanying it) provides strong indication that the Legislature intended to focus funds for the EA program only on the *actual cost* of housing, utilities and shelter. The express exclusion of advance payments, and silence with respect to social service entitlements (such as transportation, child care, nutrition allowances, etc. which had previously been made available through agency discretion) confirm this interpretation.

Further, the line item's lack of definition for the term "shelter" appears to leave determination of the meaning of that term to the administrative agency in charge of the program. The department's previous regulations had interpreted "shelter" to refer to temporary shelter, either in a family shelter or a hotel or motel or elsewhere, see 106 Code Mass. Regs. § 309.040 (2). This narrow interpretation is reasonable in view of past practices; the commonly accepted meaning of the term, see Webster's Third New Int'l Dictionary 2093 (1961); and the cut in available funding for EA. The department was not without justification in using the interpretation in construing the effect of the line item.

Considered in this context, the emergency regulations appear to be reasonably consistent with the changes mandated by the line item.

(a) The line item specifically prohibits spending any EA funds on "advance payments," so the department was clearly directed by the Legislature to stop providing advance rent under G. L. c. 18, § 2 (D) (*d*).[10]

(b) Transportation costs, child care and nutrition allowances, money for food and clothing, disaster benefits, and payment of public or subsidized housing rent arrearages and damage claims are not expressly mentioned in G. L. c. 18,

---

[10]The plaintiffs concede that advance rent constitutes an "advance payment" of the sort eliminated by the line item.

§ 2 (D) (*d*). These social service entitlements had been provided under previous EA regulations to eligible recipients, based on the department's interpretation of the scope of the program. The department had a basis to conclude that the Legislature intended to eliminate these payments.[11]

(c) Security deposits, furniture storage and moving expenses are expressly mentioned in G. L. c. 18, § 2 (D) (*d*), in connection with "the prevention of homelessness." Such payments are not specifically identified in the line item. As to these allowances, the line item may have accomplished a change by way of implied repeal. It is at least arguable that none of the three benefits affects the actual cost of housing in the sense of providing support "directly attributable" to present rent and mortgage liability or the current expense of temporary shelter. See *Boston Hous. Auth.* v. *Labor Relations Comm'n*, 398 Mass. 715, 718 (1986); *Doherty* v. *Commissioner of Admin.*, 349 Mass. 687, 691 (1965). The department was justified at this preliminary stage of the litigation in curtailing the benefits in the absence of further legislative direction that an implied repeal may not have been intended.[12] The department's choice may have been in-

---

[11]Rent and mortgage arrearages are now apparently confined under the new regulations to payments required by G. L. c. 18, § 2 (D) (*a*), for the "prevention of loss of housing." See note 3, *supra*. The new regulations eliminated allowances under § 2 (D) (*d*) for public or subsidized housing rent arrearages when such payments will not accomplish reentry to such housing. This approach is also consistent with the mandate of the line item requiring the department to focus expenditures on current housing, utility and shelter costs.

[12]The department's memorandum in the trial court in opposition to the plaintiffs' request for preliminary injunction also indicates that its interpretation of the line item has some support in light of past expenditures. The memorandum states the following: "Prior to August, 1991, approximately 29% of the emergency assistance program went to temporary shelter, 27% went to mortgage and rental arrearages and 21% went to utility arrearages. As to the benefits that were cut, approximately 18% went to advance rent and security deposits, 2% went to . . . Social Service assessments, and 4% went to other benefits (furniture, moving expenses, food, clothing, household supplies, child care and transportation). . . . These cuts of approximately 24% do not meet the spending cut of over 33% in the line item, though they approach it."

fluenced by an assumption that the Legislature acted the way it did because of the Commonwealth's unsatisfactory fiscal condition, and the competing demands placed on scarce resources to furnish help for a wide variety of pressing social problems, which include the need to keep those who have permanent shelter in their homes while simultaneously assisting a quickly increasing number of homeless, who, out of necessity, have to receive immediate shelter to avert disaster. This assumption has not been shown to be unreasonable.

The Legislature's apparent decision to restructure the scope of the EA program will undoubtedly cause substantial hardship to many recipients of EA benefits, as the affidavits filed by the plaintiffs and others similarly situated poignantly point out. However, the question before us is not the wisdom of the legislative enactment, but whether the department properly took preliminary steps to implement it. While we understand and sympathize with the plaintiffs' dire circumstances, we are satisfied that they have not adequately shown, for purposes of a preliminary injunction, that the department has acted unlawfully.

The plaintiffs, therefore, have failed to meet a critical prerequisite for the relief they seek. "The burden of showing a likelihood of success on the merits is on the party seeking the preliminary injunction. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 610 (1980). That burden has not been met." *Robinson* v. *Secretary of Admin.*, 12 Mass. App. Ct. 441, 451 (1981). Accordingly, we vacated the preliminary injunction and left the case to stand for such further proceedings as may be appropriate.