CITY OF QUINCY & another[1] vs. MASSACHUSETTS WATER
RESOURCES AUTHORITY.

Suffolk. October 3, 1995. - December 8, 1995.

Present: LIACOS, C.J., ABRAMS, LYNCH, & GREANEY, JJ.

*Massachusetts Water Resources Authority. Sewer. Municipal Corporations*, Sewers. *Administrative Law*, Regulations, Rate setting. *Statute*, Construction. *Practice, Civil*, Summary judgment. *Moot Question.*

The record of a challenge by a municipality to the sewer charges assessed by the Massachusetts Water Resources Authority (MWRA) pursuant to its authority under St. 1984, c. 372, § 10 (*a*), demonstrated that the MWRA gave adequate and careful consideration of the statutory factors in its rate setting methodology for the fiscal years 1985 through 1994 and its use of the population and population-equivalent methodology pending the shift to a system based on metered sewerage flow was therefore in compliance with its statutory mandate. [467-470]

In an action seeking declaratory relief with respect to sewage assessments, the question of remedies was moot where the judge correctly determined, on the plaintiffs' motions for partial summary judgment, the issue of liability in favor of the defendant Massachusetts Water Resources Authority, and correctly entered judgment on all claims in the plaintiffs' complaints. [470-471]

CIVIL ACTION commenced in the Superior Court Department on July 13, 1993.

The case was heard by *Gordon L. Doerfer*, J., on motions for partial summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Peter L. Koff* for city of Quincy.

[1]Boston Water and Sewer Commission (commission) was permitted to intervene as a plaintiff in the case. See Mass. R. Civ. P. 24, 365 Mass. 769 (1974).

*Laura Steinberg (Lisa F. Sherman* with her) for Boston Water and Sewer Commission.

*E. Michael Sloman (Richard Goldstein* with him) for the defendant.

GREANEY, J. The defendant, Massachusetts Water Resources Authority (authority), is responsible for providing sewage collection services to communities in the metropolitan Boston area, including the cities of Quincy and Boston.[2] The city of Quincy commenced this action in the Superior Court seeking a declaration pursuant to G. L. c. 231A (1994 ed.), that the authority's annual sewer assessments for fiscal years 1985 through 1994, which were calculated based on the so-called population and population-equivalent methodology, were in violation of various provisions of St. 1984, c. 372, the authority's enabling legislation. The Boston Water and Sewer Commission intervened. The plaintiffs each moved for partial summary judgment limited to the issue of the authority's compliance with its enabling legislation. See Mass. R. Civ. P. 56 (a), (d), 365 Mass. 824 (1974).[3] A judge in the Superior Court ordered full summary judgment for the authority, see Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974), and a judgment entered dismissing the plaintiffs' complaints. The plaintiffs appealed, and we transferred the case to this court on our own motion. We agree with the judge's conclusion that the authority's annual sewer assessments were calculated in a manner consistent with its statutory authority,

---

[2]The authority's enabling legislation refers to the municipalities and other political subdivisions of the Commonwealth which use the authority's sewerage and water delivery services as "local bod[ies]." See St. 1984, c. 372, § 2 (*h*). Quincy and the commission are "local bodies" for purposes of the legislation.

[3]The complaint filed by the commission also alleges that the authority's assessments for water distribution have not complied with its enabling legislation. So far as the summary judgment record indicates, the authority's assessments for water delivery have been based on the metered volume of water supplied to a member community. The commission's motion for partial summary judgment makes no reference to the authority's water delivery charges, nor is that issue addressed in its brief to this court. We assume, as the judge appears to have done, that the commission has abandoned its challenge to the authority's water delivery charges.

and, accordingly, that the case was an appropriate one for full summary judgment. We vacate the judgment of dismissal and direct the entry of a judgment which declares the rights of the parties.

The undisputed factual background of the case may be summarized as follows. The authority was created in 1984, and, effective July 1, 1985, succeeded the Metropolitan District Commission as the State agency responsible for the operation, regulation, financing, and improvement of the systems of water delivery and sewage collection, treatment and disposal for a number of communities in the metropolitan Boston area. The authority's sewerage services to the member communities, or "local bod[ies]," are wholesale services, meaning that the authority collects, treats, and disposes of the wastewater from local sewers operated by the member communities.

Section 10 (*a*) of St. 1984, c. 372, authorizes the authority to "establish and adjust" charges for sewerage services provided by the authority, sufficient to meet all of the costs the authority incurs for debt service, current operations and capital improvement projects. [4] The authority's rate setting powers are exercised independently by its board of directors and are not subject to supervision or regulation by any other agency of the Commonwealth. See St. 1984, c. 372, § 10 (*a*), second par. Although the authority possesses broad rate setting power, the Legislature has directed that its charges be structured to advance or promote, certain policies, including water conservation and environmental protection. Section 10 (*a*) of St. 1984, c. 372, directs that the charges levied by the authority,

"shall give account to (*i*) actual costs to the Authority of providing services, (*ii*) reasonable provisions in the nature of incentives and disincentives to promote conservation of resources and protection of the environment

[4]The authority receives some revenue from investment income, reserve funds, and State and Federal grants, but most of its revenue is derived from charges to the local bodies it serves.

and to induce the protection, maintenance and improvement of the sewer and waterworks systems and of sewer and water systems of local bodies, (*iii*) reasonable provisions reflecting the contribution made by local bodies through expenditures including, but not limited to, leak detection, system rehabilitation and other water management programs, sewerage inflow/infiltration reduction projects, separation of combined sewers and other projects which improve the overall efficiency of the Authority's and local bodies' service delivery, (*iv*) reasonable provisions to reflect respective local bodies' disproportionate historic investment in the sewer and waterworks systems and in the former metropolitan district commission sewer system and metropolitan district commission water system used in the services delivered by the Authority, (*v*) reasonable interest charges and penalties for delinquency in payment."

Since its establishment, the authority has apportioned charges for sewerage services according to a methodology, originally adopted by the Metropolitan District Commission, known as the population and population-equivalent methodology. Under this methodology, the projected costs of operating the sewerage system are divided into two components, capital costs (consisting of debt service and long-term capital expenditures for upgrading facilities), and operation and maintenance costs. The operation and maintenance costs are apportioned among the user communities based on the "contributing population" of each community, meaning the number of persons who are connected to the local sewer system. The capital costs are apportioned based on each user community's census population, on the theory that the entire community benefits from improvements to the authority's system. Nonresidential users, such as industrial, commercial and institutional users, are factored in as "population equivalents" in their respective communities, based on the volume, capacity, and suspended solids of their wastewater streams.

The plaintiffs have invested substantial resources in improving their local sewer systems, including expenditures to reduce inflow and infiltration.[5] As the judge noted, it is conceded that the population and population-equivalent methodology employed by the authority during fiscal years 1985 through 1994[6] to apportion charges did not "identify actual flows generated by each local body or provide incentives for local bodies to reduce their wastewater flows or to promote conservation. . . . The methodology did not give account to local bodies' differing rates of infiltration and inflow. . . . The [authority] also admitted that it never determined whether the plaintiffs' historic investments in their sewer systems were disproportionate to the investments of other local bodies."

1. Under § 10 (*a*), the authority's charges are established and reviewable in accordance with the notice and hearing procedures established by G. L. c. 30A (1994 ed.). On the basis of this provision in § 10 (*a*), the judge and the parties concluded (correctly, in our view) that the authority's rate setting methodology should be reviewed as a regulation. See *Steinbergh* v. *Rent Control Bd. of Cambridge*, 410 Mass. 160, 162 (1991) (agencies' charges or assessments of general application may be reviewed as regulations under G. L.

---

[5]"Inflow" is extraneous water, including rainwater, that enters a sewer system from a public source, such as a manhole cover, or a private source, such as a roof drain or a sump pump. "Infiltration" is groundwater that leaks into a sewer system through defective pipes, pipe joints, and sewer connections. According to the authority, inflow and infiltration account for close to one-half of the wastewater stream which reaches the authority's waste treatment facilities.

[6]In 1993, the Legislature instructed the advisory board (board) of the authority to consider alternate methods of assessing sewer service charges. See St. 1993, c. 110, § 283. In June, 1994, a committee established by the board selected an alternative sewer rate methodology, which allocates operation and maintenance costs based on metered flow and apportions the authority's capital costs based, with respect to each local body, in part on metered flow, in part on contributing population, and in part on census population. The Legislature has instructed the authority to implement the new sewer charge assessment methodology for fiscal year 1996. See St. 1994, c. 60, § 220A.

c. 30A). "Regulations properly adopted by an administrative agency stand on the same footing as statutes and all rational presumptions are to be made in favor of their validity. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293 (1979). . . . Such regulations are not to be declared void unless their provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate, *Massachusetts Nurses Ass'n* [v. *Board of Registration in Nursing*, 18 Mass. App. Ct. 380, 389 n. 19 (1984)]. . . ." *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 595-596 (1992). Nonetheless, the principle of deference is not one of abdication, and a regulation that is irreconcilable with an agency's enabling legislation cannot stand. See *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Management Bd.*, ante 196, 211 (1995).[7]

The plaintiffs contend that the authority's use of the population and population-equivalent methodology, which admittedly does not adjust assessments based on all of the factors listed in § 10 (*a*), is irreconcilable with the language of that section, which, by its use of the term "shall," is made mandatory rather than discretionary. In addition to § 10 (*a*), the plaintiffs rely on several other provisions of the enabling legislation to bolster their contention that the Legislature intended the authority to move immediately to a rate setting methodology which adjusts assessments to local communities based on the factors listed in § 10 (*a*).[8]

---

[7]We have addressed the plaintiffs' arguments under the line of cases which holds that a regulation adopted by an agency must be in conformity with the agency's governing legislation. See, e.g., *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Management Bd.*, ante 196, 211 (1995), and cases cited. Thus, we need not consider the precise meaning of the word "illegal" as it is used in *Borden, Inc.* v. *Commissioner of Pub. Health*, 388 Mass. 707, 721-723, cert. denied sub nom. *Formaldehyde Inst., Inc.* v. *Frechette*, 464 U.S. 936 (1983), a point in dispute between the parties.

[8]In addition to § 10 (*a*), the plaintiffs point to the following provisions of St. 1984, c. 372, § 8, as supporting their position.

Section 8 (*m*) provides, in pertinent part:

"The procedures, regulations, charges and licensing, permitting and other programs of the Authority shall also reasonably provide for abate-

The word "shall," of course, "is ordinarily interpreted as having a mandatory or imperative obligation." *Hashimi* v. *Kalil*, 388 Mass. 607, 609 (1983). Here, however, the use of "shall" in § 10 (*a*), is tempered by the succeeding words, "give account to," rather than words such as "include" or "incorporate," which are unmistakable words of command. See *Associated Indus. of Mass.* v. *Secretary of the Commonwealth*, 413 Mass. 1, 7 (1992). Viewed in the context of the legislation as a whole, and § 10 in particular, which grants to the authority broad discretion in the establishment and adjustment of its rates, we think the term "shall give account to" requires the authority to consider, but not necessarily to include, the statutory factors in its assessment methodology. The language of § 8 (*m*), which requires that the charges of the authority "shall also reasonably provide" for abatement of inflow and infiltration, as well as leak detection and repair, similarly reflect a grant of discretion to the authority with respect to the means selected for achieving these ends.

The undisputed material in the record establishes that the authority has given adequate and careful consideration to inclusion of the § 10 (*a*) factors in its rate setting methodology. The report prepared in compliance with § 8 (*e*) evaluated alternative rate setting methodologies that might more closely approximate a community's actual use of the authority's sewer and wastewater treatment facilities. Like the population and population equivalent methodology, the proposed alternatives also would have failed to reflect and to distribute appropriately costs associated with unnecessary infiltration and inflow. The authority made the reasonable decision to

ment, reduction and prevention of infiltration and inflow . . . . The procedures, regulations, charges, licensing, permitting and other programs of the Authority shall also reasonably provide for leak detection and repair, for programs for water conservation. . . ."

Section 8 (*e*) directs the authority to "promote water conservation and environmental quality through its schedule of charges," and directs it to prepare a "comprehensive study of environmental, social and economic impacts of its charges to serve as a basis for the implementation of charges fully consistent with the objectives of [the enabling legislation]."

defer any significant alteration in its method of setting rates until, with the installation of meters, it could shift to a rate setting methodology based on a relatively close approximation of a community's actual use of the system and, therefore, capable of offering appropriate incentives for local improvements in efficiency.

The authority's use of the population and population-equivalent methodology pending the shift to a system based on metered sewerage flow therefore was in compliance with its legislative mandate. See *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, *supra.* Because the authority is required to recoup most of its operating costs from charges to its member communities, any reduction in its charges to one community inevitably will result in an increase in charges to another. It was the authority's position, not contested on this record, that a temporary, interim alteration of the rate setting method would have unfairly burdened some communities. It was reasonable (and proper) for the authority to defer altering its rate setting methodology until it could implement a more equitable method which utilized data closely approximating actual system usage.[9]

2. The plaintiffs also contend that the judge abused his discretion by granting summary judgment in full to the authority on the plaintiffs' motions for partial summary judgment. The plaintiffs do not dispute that judgment could enter for the defendant on the issues raised in the plaintiffs' motions. See Mass. R. Civ. P. 56 (c) ("Summary judgment, when appropriate, may be rendered against the moving party"). They claim, however, that when their motions addressed only issues of liability, the judge could not enter full summary judgment, encompassing questions related to remedy, without providing them notice and an opportunity to be heard. In support of their position, they rely on *Gamache* v. *Mayor of N. Adams*, 17 Mass. App. Ct. 291, 295 (1983), in which the

---

[9]In view of our conclusion that the authority's rate setting methodology was in compliance with its enabling legislation, we need not consider whether, as Quincy contends, the judge erred by placing a burden on the plaintiffs to articulate an alternate rate setting methodology.

Appeals Court stated that a judge has "the power, sua sponte, to enter full summary judgment [on a motion for partial summary judgment], provided the parties had sufficient notice of his intention to do so, opportunity to submit affidavits, and a right to be heard on the matter." Here, the plaintiffs contend, they were denied notice and the right to be heard before full judgment entered on their claims.

The judge resolved the question of liability in the authority's favor, and we have affirmed that decision. When there is no liability, the question of remedies obviously becomes moot. In these circumstances, notice and the opportunity to submit affidavits would not avail the plaintiffs. In addition, the judge properly could conclude that judgment should enter with regard to any claims of future liability, because the evidence was uncontroverted that the authority is in the process of adopting a new rate setting method dictated by legislation which is very specific on this point. See St. 1994, c. 60, § 220A. Cf. *Flint* v. *Commissioner of Pub. Welfare*, 412 Mass. 416, 419 (1992) (claim may become moot because of material changes in statute on which claim is based). It was appropriate to enter judgment on all claims in the complaint.

3. The judgment is vacated. A judgment is to enter declaring that the authority's method of setting rates and assessing charges between fiscal years 1985 and 1994, was in conformity with St. 1984, c. 372.

*So ordered.*