CECELIA LIJOI[1] *vs.* MASSACHUSETTS BAY TRANSPORTATION AUTHORITY. No. 88-P-1118. January 16, 1990. *Limitations, Statute of. Husband and Wife*, Consortium. *Parent and Child*, Companionship and society.

Cecelia Lijoi sued for herself, and as next friend of the two children of the marriage, for loss of spousal and parental consortium. The consortium claim arose from a deterioration of relationships which followed upon a physical injury on June 23, 1971, to Ernesto Lijoi, the husband/father, occasioned, as the plaintiff alleged, by negligence of the Massachusetts Bay Transportation Authority (MBTA). The MBTA moved for summary judgment on the ground that the applicable two-year statute of limitations, G. L. c. 161A, § 21 (MBTA tort statute, see *O'Brien* v. *Massachusetts Bay Transp. Authy.*, 405 Mass. 439, 440 [1989]), had run on the consortium claim several years before the action was filed on June 7, 1984. A judge of the Superior Court denied the motion without opinion. The MBTA appeals from the order, a single justice of this court having allowed interlocutory review. We reverse the order and grant summary judgment in favor of the MBTA.

In support of its motion, the MBTA submitted copies of medical reports and MBTA injury report forms reporting the results of medical examinations of Ernesto; the plaintiffs' answers to interrogatories; a deposition of Cecelia Lijoi; and admissions on the part of Cecelia resulting from the failure to respond to requests for admissions. The plaintiff did not present any materials in opposition to the motion.

This is in the class of personal injury cases where the running of limitations may be affected by the time the plaintiff "discovers" the factual basis for the claim. See *Gore* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. 645, 647 (1984). So the focus of inquiry in the following narrative is when the plaintiff perceived, or in reason should have perceived, the sub-

---

[1]Suing for herself and as next friend of the children, Joseph R. and Ernest D. Lijoi.

stantial worsening of intrafamily associations and feelings and its connection with Ernesto's physical and psychological troubles.

1. Ernesto started work as a police officer for the MBTA in May, 1971. On June 23, 1971, a disorderly person, whom Ernesto and another officer were placing under arrest, struck Ernesto on the head several times with a full wine bottle. The complaint charged the MBTA with responsibility for the physical injury, and thus for the consequent damage to the consortium interests, in that it had failed to train Ernesto adequately for the job so that he would have known how to avert such an attack.

Within twenty-four hours of the incident, Ernesto fell to the ground unconscious and was admitted to Carney Hospital in Dorchester. The attending physician concluded that Ernesto had suffered a seizure and informed him that the seizure resulted from the blows to the head. Anti-seizure medication (Dilantin and Phenobarbital) was prescribed. Ernesto remained in the hospital two days and returned to work on June 25 or 28, 1971.

From 1971 to 1983 (and beyond) Ernesto suffered recurrent seizures despite his continuing with the medication. As instances: On February 8, 1973, he injured his back in the course of duty and in January, 1974, he underwent surgery. Seizures linked to the 1971 accident interfered with recovery and exacerbated the pain in his back. He was unable to work for periods of time in 1974 and 1975. After symptoms of a seizure on June 14, 1975, Ernesto experienced blindness in his left eye. He was hospitalized at Massachusetts General Hospital for neurological tests from June 14 to 17, 1975. The neurologist informed him that the loss of sight and the seizures were likely due to the same cause. On June 17, 1975, Ernesto reported his symptoms and hospitalization to the MBTA police; he indicated that he had been experiencing similar "attacks" since the June, 1971, arrest.

In 1978, Ernesto left the MBTA and commenced working as a police officer for the city of Quincy. In February, 1983, he had three seizures and returned to Carney Hospital. A CT scan in March, 1983, showed an area of "calcification" and CT scans at Boston University Hospital in 1984 confirmed an area of "density" consistent with an injury to the brain. Neuropsychological testing indicated the presence of a "focal left temporo-parietal abnormality" (left middle brain area). On the basis of the CT scans and other tests, the testing physician concluded that Ernesto had sustained a brain injury from the 1971 incident of which the seizures were manifestations. He believed that Ernesto would be totally incapacitated for the Quincy job.

2. In her answers to interrogatories filed on September 17, 1984, Cecelia Lijoi said she had been deprived of Ernesto's companionship and comfort "for several years" but with increased loss during the past two years. At her deposition on April 6, 1987, when shown the June, 1975, injury report and questioned about Ernesto's "attacks," Cecelia responded that between June, 1971, and June, 1975, Ernesto would sometimes "have a group of them [seizures], like two or three of them within two or three days."

She noticed that after he suffered several attacks around 1971 and 1972, Ernesto's behavior changed: he preferred to stay at home "because he was leery of having them in front of somebody." So also, at least by 1972 there was a change in his relationship to her and the children; he no longer wanted to participate in neighborhood events and withdrew from family and friends: he became a "loner" and continued so.

There is no dispute that Cecelia knew of the 1971 incident and the seizure on the night of June 23. In her deposition, she said she did not initially "know for sure" that the seizures were caused by that incident. However, she dated June, 1971, as the onset of Ernesto's changes of behavior and attitude. Her lack of response to the request for admissions filed by the MBTA on August 3, 1987, resulted in the admission (among others) that prior to 1976 she was aware that "her husband's seizures were probably caused by his being struck on the head on June 23, 1971."

3. Our question is when the consortium claim[2] accrued for limitations purposes, and the measure of the case is that Cecelia recognized a substantial degeneration of the relationships, and its probable tie to the 1971 episode, by the year 1976 at the very latest. We can take it that there was deeper deterioration in the period surrounding the commencement of the action in 1984, but that did not suspend or postpone the running of the statutory period. With the injury and its likely cause manifest by 1976, "the statute of limitations does not stay in suspense until the full extent, gravity, or permanence of that same injury . . . is known." *Gore* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. at 649.

To put the matter in other words: Where injury is present but not discernible, or an injury is recognized but its cause is not ascertainable, accrual of the cause of action is held to be in abeyance until the time when a modicum of knowledge supplants ignorance in the mind of the claimant, or may be reasonably imputed to her. See *Hendrickson* v. *Sears*, 365 Mass. 83 (1974); *Franklin* v. *Albert*, 381 Mass. 611, 618-620 (1980); *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 129-130 (1982); *Malapanis* v. *Shirazi*, 21 Mass. App. Ct. 378, 383-388 (1986). In the present case the period of suspension at its uttermost ended in 1979, more than two years after there was knowledge of both injury and probable cause. The period is not enlarged to take in any interval in which the injury incubates from the substantial to the very grave. See *Olsen* v. *Bell Tel. Labs. Inc.*, 388 Mass. 171, 175 (1983); *Gore* v. *Daniel O'Connell's Sons*, 17 Mass. App. Ct. at 647-649; *Lear-Heflich* v. *Schwartz*, 21 Mass. App. Ct. 928, 929-930 (1985).[3]

---

[2]The consortium claim had status independent of any claim by the husband for the physical injury, see, e.g., *Feltch* v. *General Rental Co.*, 383 Mass. 603, 606-610 (1981).

[3]The *Gore* case involves damage to consortium interests after a head injury to the husband/father and is close in its facts to the present case.

If Cecelia's own consortium claim was lost by failure to assert it in time, so also were the similar claims of the children.[4]

We do not deal with the MBTA's argument that under its statute, G. L. c. 161A, § 21 (inserted by St. 1964, c. 563, § 18), the "discovery" proposition, as we have described it, does not apply, and the period of limitations should run from either the time of injury to Ernesto, or the time Cecelia experienced loss of consortium even if she did not suspect the cause.[5]

The order appealed from is reversed and judgment will enter for the defendant dismissing the action.

*So ordered.*

*David Shaughnessy* (*Jonathan Feltner* with him) for the defendant.
*Theodore J. Dennis* for the plaintiffs.


---

[4]In *Ferriter* v. *Daniel O'Connell's Sons*, 381 Mass. 507 (1980), where a child's claim for loss of parental society was first recognized, the court, as a matter of sound administration and fairness, declared that no child's claim would be entertained if a spouse's consortium claim arising from the same incident was barred by the running of limitations before September 9, 1980, the date of the *Ferriter* opinion. 381 Mass. at 516-517 n.12. See also *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 167 (1973).

Much of the *Ferriter* decision was repealed by St. 1985, c. 572, § 35, but this was effective from December 10, 1985. See *Powell* v. *Cole Hersee Co.*, 26 Mass. App. Ct. 532, 534 (1988). For purposes of the present case, *Ferriter* remains in force, but the Lijoi claims are barred by limitations, as indicated.

[5]The MBTA points to the statutory language "any action for such personal injury . . . shall be commenced only within two years next after the date of such injury," and urges an analogy to *Pobieglo* v. *Monsanto Co.*, 402 Mass. 112 (1988), a wrongful death case. We refrain from comment.