Neal **DAVIGNON,** Patricia **Kelley, Amanda Davignon,** and **Chelsea Davignon, Plaintiffs,**

v.

Karl D. **CLEMMEY,** Karl D. **Clemmey, Jr., Clemmey, Inc.,** and **Clemmey Auto Company, Inc., Defendants.**

No. 99–11875–WGY.

United States District Court, D. Massachusetts.

Nov. 7, 2001.

Order Amending Memorandum on Reconsideration Nov. 21, 2001.

Sol J. Cohen, Somerville, MA, Leonard H. Kesten, Brody, Hardoon, Perkins & Kesten, Boston, MA, John P. LeGrand, John P. LeGrand & Associates, PC, Somerville, MA, Andrea W. McCarthy, Brody, Hardoon, Perkins & Kesten, Boston, MA, Michael R. Pizziferri, Boston, MA, for Plaintiffs.

Harvey A. Schwartz, Rodgers, Powers & Schwartz, Bruce F. Smith, Jager, Smith & Stetler, Michael J. Traft, Carney & Bassil, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON POST–TRIAL MOTIONS

YOUNG, Chief Judge.

A jury found the individual defendants liable for assault and battery, intentional infliction of emotional distress, and violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I. The jury's award totaled $4,850,000.00. This memorandum addresses the defendants' post-trial motion to set aside or reduce the verdict, and the plaintiffs' petition for attorneys' fees and costs.

## I. INTRODUCTION

The individual defendants are Karl Clemmey and his son, "Dan" Clemmey (together, the "Clemmeys"). Karl Clemmey owns real estate and an auto shop in Mansfield, Massachusetts. The plaintiffs are Neal Davignon and Patricia Kelley (together, the "Davignons"), along with their children Amanda and Chelsea (collectively, the "Davignon family"). Neal Davignon worked in the Clemmeys' auto shop. The Davignon family lived in a house supplied by Karl Clemmey. When the employment relationship turned sour, so did the landlord-tenant relationship. And then it got ugly.[1]

Most of the panoply of fisticuffs, arguments, calls to the police, letters from lawyers, civil actions, criminal actions, and general unpleasantries is not germane to this discussion. Only the following is pertinent: In January 1998, Karl Clemmey (or more precisely, a trust created by Karl Clemmey) brought an action for summary process in the Southeast Division of the Massachusetts Housing Court to evict Neal Davignon and Patricia Kelley for failure to pay rent. Over the next several months, the Clemmeys terrorized the Davignon family, stalking them, strewing trash over their front yard, breaking windows, making a variety of false criminal claims, and even going so far as to attempt to have the Davignon children separated from their parents upon spurious child abuse claims.

In July 1998, the litigants entered into an agreement for judgment in the Housing Court litigation, but only after Neal Davignon and Patricia Kelley had brought coun-

---

1. As it is required to do, the Court views the evidence adduced at trial in the light most favorable to the jury verdict. *Morrison v.*

*Carleton Woolen Mills, Inc.,* 108 F.3d 429, 436 (1st Cir.1997).

terclaims against Karl Clemmey for intentional infliction of emotional distress. Pursuant to the agreement, the Davignon family quit the house in Mansfield. They moved to Rhode Island. More than a year went by. Then the Davignon family brought this diversity action in federal court, based on the terror they had endured in Mansfield.

The case went to trial in this Court and a jury awarded the Davignon family collectively $4,850,000.00. This aggregate award includes $350,000.00 to Neal Davignon as a result of an assault by Karl Clemmey, and $1,000,000.00 to Neal Davignon, $1,000,000.00 to Patricia Kelley, $1,250,000.00 to Amanda Davignon, and $1,250,000.00 to Chelsea Davignon against Karl and Dan Clemmey jointly and severally for intentional infliction of emotional distress and violation of the Massachusetts Civil Rights Act.

After the jury verdict, the plaintiffs petitioned for attorneys' fees and costs, and the defendants brought a motion seeking judgment notwithstanding the verdict, a new trial, remittitur, and enforcement of the earlier agreement for judgment in Housing Court. The Court held a hearing on September 13, 2001, and ruled on some of these issues from the bench. This memorandum sets forth the reasoning behind those rulings and addresses the issues left unresolved at the hearing.

## II. DEFENDANTS' POST-TRIAL MOTIONS

### A. Motion for Judgment Notwithstanding the Verdict or for a New Trial

This motion simply reiterates various procedural and evidentiary issues that the defendants raised at trial, which the Court thoroughly considered at that time. It adds nothing new. For this reason, the Court denied the motion from the bench.

### B. Motion for Remittitur

So central is the role of the jury to the proper award of compensatory damages, *Ciulla v. Rigny*, 89 F.Supp.2d 97, 100–03 (D.Mass.2000), that motions for remittitur after a jury verdict ought rarely, if ever, be granted. It is true, however, that this is the largest civil injury tort verdict ever recorded in this session of the United States District Court.

From this fact defense counsel argues, referencing other cases with other fact patterns, that this Court ought exercise the power granted to it by Federal Rule of Civil Procedure 59 and unilaterally order a reduction in the verdict or a new trial. The Court notes, however, that the perceived abuse of the judicial remittitur power is coming under increased critical scrutiny by Congress, *see* S. Rep. 107–42, at 118 (2001) (criticizing judicial "limits on jury awards" and requiring a report of measures that can be taken "to ensure that juror and citizen confidence are not eroded"), and legal commentators, *e.g.*, Kevin M. Clermont & Theodore Eisenberg, *Anti–Plaintiff Bias in the Federal Appellate Courts*, 84 Judicature 128 (Nov.-Dec. 2000); Cynthia J. Cohen,[2] *Whatever Happened to the Seventh Amendment?*, Boston B.J., Nov.-Dec.1991, at 17, 19.

Yet neither the uninformed pseudofactual comparison of disparate factual situations nor the general views of Congress and commentators has any direct bearing on the duty of this Court in the particular circumstances of this case. That duty is rationally and reflectively to consider whether the award is "grossly excessive, inordinate, shocking to the conscience of

**2.** Presently a justice of the Massachusetts Appeals Court.

the court, or so high that it would be a denial of justice to permit it to stand," *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1161 (1st Cir.1996) (internal quotation marks omitted), or whether it "exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it," *E. Mountain Platform Tennis, Inc. v. Sherwin–Williams Co.*, 40 F.3d 492, 502 (1st Cir.1994) (internal quotation marks omitted).

■ Under either formulation, the jury award here must stand. The case was fairly and professionally tried on both sides, without flamboyance or appeals to prejudice or sympathy. On the factual record, the Court is not shocked by the outcome. It must be remembered that the Clemmeys intentionally and maliciously sought to have the Davignon children separated from their parents. The emotional distress attendant upon such potential separation is compensable in Massachusetts both at common law and by statute. *See Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980) (establishing dependent child's loss of consortium action for injury to parent), *superseded by statute on other grounds as stated in Lijoi v. Mass. Bay Transp. Auth.*, 28 Mass.App.Ct. 926, 548 N.E.2d 893 (1990); *Prince–Jackson v. Children's Hosp. Med. Ctr.*, No. 72769 (Mass.Super.Ct. Apr. 8, 1985) (declaring for the first time that a parent could recover for the loss of consortium arising out of injuries to a minor child, a position later enacted into law, Mass. Gen. Laws ch. 231, § 85X); *see also* Mass. Gen. Laws ch. 231, § 85X (reversing *Norman v. Mass. Bay Transp. Auth.*, 403 Mass. 303, 529 N.E.2d 139 (1988), which nevertheless stated that "[s]ociety is rightly less concerned about the burden placed on an intentional wrongdoer than about the burden placed upon one who has been

merely negligent," *id.* at 307, 529 N.E.2d 139).

In the face of this clearly established public policy in Massachusetts, it would constitute judicial hubris for a federal court to take away the careful evaluation of the jury here. For these reasons, the Court denied the motion for remittitur from the bench.

## C. Motion to Enforce Agreement for Judgment in Housing Court

As noted above, in January 1998, Karl Clemmey, as trustee of the 360 Chauncy Street Realty Trust, commenced summary process eviction proceedings in the Massachusetts Housing Court for the Southeast Division against Neal Davignon and Patricia Kelley. The Davignons responded with counterclaims. Six months later, on June 8, 1998, the Davignons added 360 Chauncy Street LLC (the "LLC") and Karl Clemmey, among others, as defendants in counterclaim. Defs.' Mem. Ex. A. The Davignons included the following counterclaims:

> 34. The defendants in Counterclaim ... 360 Chauncy Street, L.L.C. and Karl D. Clemmey, individually have intentionally or recklessly cause[d] the Plaintiffs in Counterclaim sever[e] emotional upset distress and anxiety.

> 35. The actions of ... Karl D. Clemmey, individually, have been outrageous and beyond the bounds of decent behavior in a civilized society. As a result of this, Plaintiffs in Counterclaim have been injured and hereby claim damages in such amount as may be proved at trial, plus interest on this amount at 12% calculated from the date of filing of this pleading.

*Id.* Ex. B. One month later, on July 11, 1998, Karl Clemmey and the LLC answered the Davignons' complaint. Nine days later, on July 20, 1998, the LLC and

the Davignons entered into an agreement for judgment. The agreement does not specifically name or mention Karl Clemmey, but the agreement identifies the case number pertaining to the Davignons' counterclaims against Karl Clemmey and the LLC. Under the agreement, the LLC gained possession of the house but agreed to pay the Davignons for attorneys' fees and whatever moving expenses they incurred. Of most importance, the agreement contains the following term:

> 7) The parties agree to waive all claims and counterclaims regarding this matter with prejudice.

*Id.* Ex. C.

The key question for the Court is the extent to which the Housing Court agreement precludes the verdict against Karl Clemmey for intentional infliction of emotional distress and violation of the Massachusetts Civil Rights Act.

### 1. Emotional Distress—Released?

■ The parties frame the question as matter of contract law: *Who* settled the case in Housing Court and *what* did they agree to settle? As to "who," the parties quibble over the fact that Karl Clemmey's name does not appear on the agreement for judgment. As to "what," the parties quibble over the fact that the agreement came on the heels of the Davignons' last set of counterclaims, leaving room for interpretation as to what emotional distress, if any, the agreement considered.

■ The parties are correct that an agreement for judgment is a contract, *Kelton Corp. v. County of Worcester*, 426 Mass. 355, 359–60, 688 N.E.2d 941 (1997), which might require a party to release future claims in addition to those actually brought, or alternatively might preserve claims so they could be raised again in subsequent litigation. But the parties forget that "[t]he great weight of authority

supports the principle that [a consent] decree is as binding and conclusive upon the parties as if it had been entered after a trial and a determination of all the issues." *Fishman v. Alberts*, 321 Mass. 280, 281, 72 N.E.2d 513 (1947), *quoted with approval in Kelton Corp.*, 426 Mass. at 359, 688 N.E.2d 941. Thus, it does not matter that the *agreement* omits specific reference to Karl Clemmey and the intentional infliction of emotional distress because the Housing Court effectively entered *judgment* with respect to the Davignons' claim against Karl Clemmey for intentional infliction of emotional distress and, absent any contractual provision to the contrary, principles of res judicata (specifically, claim preclusion) prohibit a second bite at that claim in federal court. The more interesting question is whether those principles also preclude the civil rights claim, which was not raised in Housing Court.

### 2. Massachusetts Civil Rights Act— Claim Precluded?

■ The parties fail to address the preclusive effect of the agreement for judgment in Housing Court on the jury verdict against Karl Clemmey for violation of the Massachusetts Civil Rights Act. The closest the parties come is the following footnote found in the defendants' memorandum:

> The release waived the plaintiffs' rights in regard to their claim for intentional infliction of emotional distress. Since the present counts for infliction of emotional distress and for violation of civil rights were based on [the] same conduct by the Clemmeys and the injuries caused by that conduct were *identical,* as the court ruled, the release runs to both counts. Ruling to the contrary would allow a party to execute a release of a claim based on one legal theory and then still prosecute a claim based on the

same wrongful conduct and causing the same injuries if that claim is based on a different legal theory.

Defs.' Mem. at 9 n. 5. Although the defendants never articulate the legal principle, they essentially argue that claim preclusion—as opposed to any principle of contract law—prevents the Davignons from raising in this Court any claim that was *or could have been* raised in Housing Court.

### a. Elements of Claim Preclusion

▉▉▉▉▉ "Three elements are essential for invocation of claim preclusion: (1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits." *DaLuz v. Dep't of Corr.*, 434 Mass. 40, 45, 746 N.E.2d 501 (2001) (citing *Franklin v. N. Weymouth Coop. Bank*, 283 Mass. 275, 280, 186 N.E. 641 (1933)). Claim preclusion applies "even though the claimant is prepared in a second action to present different evidence or legal theories to support his claim, or seeks different remedies." *Heacock v. Heacock*, 402 Mass. 21, 23, 520 N.E.2d 151 (1988) (citing *Mackintosh v. Chambers*, 285 Mass. 594, 596–97, 190 N.E. 38 (1934)), *cited with approval in Blanchette v. Sch. Comm.*, 427 Mass. 176, 179 n. 3, 692 N.E.2d 21 (1998).

### b. Exception for Lack of Jurisdiction

▉▉▉▉▉ Claim preclusion bars not only claims that were litigated in an earlier action, but also claims that could have been litigated. An exception to the "could have been litigated" sweep of claim preclusion is when the first court would not have had jurisdiction over the claim in question. For example, judgments in Probate Court have not precluded subsequent judgments in Superior Court for negligence, *Feener v. New England Tel. & Tel. Co.*, 20 Mass. App.Ct. 166, 169–71, 478 N.E.2d 1289

(1985), or intentional tort, *Heacock*, 402 Mass. at 23–25, 520 N.E.2d 151, because the Probate Court does not have jurisdiction to hear tort actions or to award damages, Mass. Gen. Laws ch. 215, §§ 3, 6. These opinions are in harmony with the Restatement, which states that the general rule against claim splitting is subject to certain exceptions, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation. Restatement (Second) of Judgments § 26(1)(c) (1982), *cited with approval in City of Salem v. Mass. Comm'n Against Discrimination*, 44 Mass.App.Ct. 627, 638, 693 N.E.2d 1026 (1998).

▉▉▉▉ The Housing Court does not have jurisdiction over the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I. Or at least, it probably does not. The slight uncertainty stems from a statute that lacks lucidity and decisions that lack consistency. Accordingly, the Court will pause to consider the statute and its interpretations before returning to the question of claim preclusion.

The statute demarcating the jurisdiction of the Housing Court reads as follows:

The divisions of the housing court department shall have common law and statutory jurisdiction concurrent with the divisions of the district court department and the superior court department of all crimes and of all civil actions arising in the city of Boston in the case of that division, in the counties of Berkshire, Franklin, Hampden and Hampshire in the case of the western division and within the cities and towns included in the Worcester county division, northeastern division and southeastern division, in the case of those divisions, under chapter forty A, sections twenty-one to twenty-five, inclusive, of chapter two hundred and eighteen, sections fourteen

and eighteen of chapter one hundred and eighty-six and under so much of sections one hundred and twenty-seven A to one hundred and twenty-seven F, inclusive, and sections one hundred and twenty-seven H to one hundred and twenty-seven L, inclusive, of chapter one hundred and eleven, so much of chapter ninety-three A, so much of section sixteen of chapter two hundred and seventy, so much of chapters one hundred and forty-three, one hundred and forty-eight, and two hundred and thirty-nine, jurisdiction under the provisions of common law and of equity and any other general or special law, ordinance, by-law, rule or regulation as is concerned directly or indirectly with the health, safety, or welfare, of any occupant of any place used, or intended for use, as a place of human habitation and the possession, condition, or use of any particular housing accommodations or household goods or services situated therein or furnished in connection there with or the use of any real property and activities conducted there on as such use affects the health, welfare and safety of any resident, occupant, user or member of the general public and which is subject to regulation by local cities and towns under the state building code, state specialized codes, state sanitary code, and other applicable statutes and ordinances. The divisions of the housing court department shall also have jurisdiction of all housing problems, including all contract and tort actions which affect the health, safety and welfare of the occupants or owners thereof, arising within and affecting residents in the city of Boston, in the case of that division, Berkshire, Franklin, Hampden and Hampshire counties, in the case of the western division and within the cities and towns included in the Worcester county division, northeastern division and southeastern division, in the case of those divisions, and shall also have jurisdiction in equity, concurrent with the divisions of the district court department, the divisions of the probate and family court department, the superior court department, the appeals court, and the supreme judicial court, of all cases and matters so arising.

In all matters within their jurisdiction, the divisions of the housing court department shall have all the powers of the superior court department including the power to grant temporary restraining orders and preliminary injunctions as justice and equity may require. The divisions shall have like power and authority for enforcing orders, sentences and judgments made or pronounced in the exercise of any jurisdiction vested in them, and for punishing contempts of such orders, sentences and judgments and other contempts of their authority, as are vested for such or similar purposes in the supreme judicial court or superior court department.

Mass. Gen. Laws ch. 185C, § 3.[3]

Formatted and annotated for clarity, the same statute reads:

3. Chapter 185C is the successor to Chapters 185A and 185B, which were repealed by Act of July 18, 1978, ch. 478, § 91, 1978 Mass. Acts 586, 622. Chapter 185A concerned the Housing Court of the City of Boston while Chapter 185B concerned the Housing Court of the County of Hampden. Rather than continue adding new chapters for each new housing court, in 1978 the legislature instead created a single chapter—Chapter 185C—for all existing and future housing courts. § 92, 1978 Mass. Acts at 622–28. Section 3 of Chapter 185C as enacted in 1978 corresponds to section 3 of Chapters 185A and 185B as they were enacted in 1971 and 1973, respectively. *Compare* 1978 Mass. Acts at 622–23, *with* Act of Oct. 7, 1971, ch. 843, 1971 Mass. Acts 739, 739–40, *and* Act of Aug. 9, 1973, ch. 591,

**[a]**

▮ The divisions of the housing court department shall have common law and statutory jurisdiction concurrent with the divisions of the district court department and the superior court department of all crimes and of all civil actions arising ... under:

**[A]**

- ch. 40A (zoning);

- ch. 218, §§ 21–25 (small claims);

- ch. 186, §§ 14, 18 (wrongful acts by landlords, retaliation against whistle-blowing tenants); and

**[B]** so much of:

- ch. 111, §§ 127A–127F, 127H–127L (sanitation);

- ch. 93A (unfair business practices);[4]

- ch. 270, § 16 (trash disposal);

- ch. 143 (building inspection); .

- ch. 148 (fire prevention);

- ch. 239 (eviction); and

- jurisdiction under the provisions of common law and of equity[5] and any other general or special law, ordinance, by-law, rule or regulation as is concerned directly or indirectly with

**[i]**

**[a]** the health, safety, or welfare, of any occupant of any place used, or intended for use, as a place of human habitation

and

**[b]** the possession, condition, or use of any particular housing accommodations or household goods or services situated therein or furnished in connection therewith[6]

or

**[ii]** the use of any real property and activities conducted there on as such use affects the health, welfare and safety of any resident, occupant, user or member of the general public and which is subject to regulation by local cities and towns under the state building code, state specialized codes, state sanitary code, and other applicable statutes and ordinances.[7]

▮ The divisions of the housing court department shall also have jurisdiction of all housing problems, including all contract and tort actions which affect the health, safety and welfare of

---

1973 Mass. Acts 562, 563–64. *See generally Police Comm'r v. Lewis,* 371 Mass. 332, 336–40, 357 N.E.2d 305 (1976) (discussing legislative history of Chapter 185A).

**4.** Reference to Chapter 93A was added by Act of Apr. 6, 1979, ch. 72, § 3, 1979 Mass. Acts 38, 38–39 (overruling *Chakrabarti v. Marco S. Marinello Assocs., Inc.,* 377 Mass. 419, 386 N.E.2d 1248 (1979)).

**5.** The phrase "and of equity" was added by Act of Apr. 6, 1979, ch. 72, § 3, 1979 Mass. Acts 38, 38–39. The statute tends toward the nonsensical at this point—"jurisdiction of all civil actions arising under ... so much of ... jurisdiction under the provisions of common law and of equity ... as is concerned directly or indirectly with the health, safety, or welfare of any occupant"—but "it is reasonably clear that the words 'so much of ... as is concerned with' apply equally to every phrase in between." *Haas v. Breton,* 377 Mass. 591, 594 n. 5, 387 N.E.2d 138 (1979).

**6.** What is here denominated as subsection (a)(1)(B)(i)(b) was added by Act of Apr. 6, 1979, ch. 72, § 3, 1979 Mass. Acts 38, 38–39.

**7.** What is here denominated as subsection (a)(1)(B)(ii) was added by Act of July 14, 1987, ch. 245, 1987 Mass. Acts 514, 515, removed—apparently by accident—when much of the statute was reenacted by Act of Jan. 14, 1988, ch. 755, § 3, 1987 Mass. Acts 1518, 1519–20, and added back by Act of June 23, 1988, ch. 83, 1988 Mass. Acts 228, 228.

the occupants or owners thereof[8] . . ., and shall also have jurisdiction in equity, concurrent with the divisions of the district court department, the divisions of the probate and family court department, the superior court department, the appeals court, and the supreme judicial court, of all cases and matters so arising.

[b] In all matters within their jurisdiction, the divisions of the housing court department shall have all the powers of the superior court department including the power to grant temporary restraining orders and preliminary injunctions as justice and equity may require. The divisions shall have like power and authority for enforcing orders, sentences and judgments made or pronounced in the exercise of any jurisdiction vested in them, and for punishing contempts of such orders, sentences and judgments and other contempts of their authority, as are vested for such or similar purposes in the supreme judicial court or superior court department.

*Id.* (format and annotations supplied).[9] In other words, subsection (a)(1)(A) lists those statutes over which the Housing Court has full jurisdiction, subsection (a)(1)(B) lists those laws over which the Housing Court has jurisdiction *to the extent* the complaint relates to the "health, safety or welfare" of occupants or nearby persons, and subsection (a)(2) grants the Housing Court jurisdiction over all "housing problems." For those cases in which the Housing Court has jurisdiction, subsection (b) affords the Housing Court all the power vested in the Superior Court.

The Housing Court is designed to be an expeditious expert in housing problems. Almost all cases are heard and decided by a justice sitting without a jury, *id.* § 21, and each justice has "specialists" at his disposal, *id.* § 16. These specialists are required to be:

knowledgeable in the maintenance, repair, and rehabilitation of dwelling units; the problems of landlord and tenant as they pertain to dwelling units; the types of funds and services available to assist landlords and tenants in the financing and resolution of such problems; the federal and state laws, rules and regulations pertaining to the maintenance, repair and rehabilitation of such units;

**8.** The clause "shall also have jurisdiction . . . owners thereof" in what is here denominated as subsection (a)(2) was added by Act of Apr. 6, 1979, ch. 72, § 3, 1979 Mass. Acts 38, 38–39.

**9.** If the Housing Court has doubts about its jurisdiction, the Supreme Judicial Court has admonished the court to "avoid[ ] a waste of judicial resources by asking the Chief Administrative Justice of the Trial Court [now the Chief Justice for Administration] to transfer the case, or the judge, or both, to the appropriate department of the Trial Court." *LeBlanc v. Sherwin Williams Co.*, 406 Mass. 888, 897 n. 10, 551 N.E.2d 30 (1990). This warning is necessary as the individual trial courts in Massachusetts retain their historic identities and jurisdictions (as from time to time amended), *see* Catherine S. Menand, *A "mag-istracy fit and necessary": A Guide to the Massachusetts Court System, in Law in Colonial Massachusetts 1630–1800,* at 541, 546–49 (The Colonial Society of Massachusetts 1984), but are grouped for administrative purposes into the Massachusetts Trial Court under the administrative leadership of the Chief Justice for Administration, an administrative, not a judicial, officer. Mass. Gen. Laws ch. 211B, § 6; *see also Commonwealth v. Richards*, No. 46795, slip op. at 7 n. 4 (Mass.Super.Ct. Nov. 27, 1981) ("[I]t is no part of the limited functions of the [Chief Justice for Administration] to determine what actions may or may not be authorized by a justice presiding over a trial in any of the courts of the Commonwealth. Nothing in the language of the Court Reorganization Act confers any such power on the [Chief Justice for Administration].").

and the financing and resolution of such problems.

*Id.*

Several Massachusetts cases have addressed the scope of the Housing Court's jurisdiction. According to these cases, the Housing Court *does* have jurisdiction in cases involving:

- emergency assistance for the homeless [10]
- rent increases by the Massachusetts Housing Finance Agency [11]
- rent increases by a mobile-home rent control board [12]
- access to a garage by purchasers of an adjacent condominium [13]
- fire code violations in a commercial building [14]
- racketeering claims against drug dealers at housing projects [15]
- conveyance of an uninhabitable home from a historical society to a purchaser

who had agreed to restore the home but did not [16]

- sale of a mobile home to be used on a leased lot which the seller knew was not zoned for mobile homes [17]

The Housing Court *does not* have jurisdiction in cases involving:

- negligence and contract claims against a contractor who improperly landscaped a cemetery [18]
- fraudulent conveyance claims [19]
- products liability claims for lead-based paint [20]
- negligence claims against a contractor who repaired a septic tank improperly [21]
- police protection from racist mob attacks at housing projects [22]
- contract claims against a contractor who stopped work on an addition to a home [23]

---

**10.** *Berrios v. Dep't of Pub. Welfare,* 411 Mass. 587, 591–93, 583 N.E.2d 856 (1992).

**11.** *Tedford v. Mass. Hous. Fin. Agency,* 390 Mass. 688, 693 n. 7, 459 N.E.2d 780 (1984).

**12.** *Quinn v. Rent Control Bd.,* 45 Mass.App.Ct. 357, 370, 698 N.E.2d 911 (1998).

**13.** *McElligott v. Lukes,* 42 Mass.App.Ct. 61, 62, 674 N.E.2d 1108 (1997).

**14.** *Commonwealth v. Lappas,* 39 Mass.App.Ct. 285, 287–88, 655 N.E.2d 386 (1995).

**15.** *Springfield Hous. Auth. v. Burgos,* 32 Mass. App.Ct. 673, 677, 593 N.E.2d 1317 (1992).

**16.** *Worcester Heritage Soc'y, Inc. v. Trussell,* 31 Mass.App.Ct. 343, 347 n. 3, 577 N.E.2d 1009 (1991).

**17.** *Patry v. Liberty Mobilhome Sales, Inc.,* 15 Mass.App.Ct. 701, 704–05, 448 N.E.2d 405 (1983).

**18.** *St. Joseph's Polish Nat'l Catholic Church v. Lawn Care Assocs., Inc.,* 414 Mass. 1003, 1003 & n. 1, 608 N.E.2d 722 (1993) (rescript). The

Supreme Judicial Court ultimately held, however, that the court properly had jurisdiction because the presiding justice had requested, shortly after the Housing Court trial had begun, that he be designated as a Superior Court justice, which was accomplished approximately one month after the entry of judgment. *Id.* at 1003–04, 608 N.E.2d 722.

**19.** *Ryan v. Kehoe,* 408 Mass. 636, 638–42, 562 N.E.2d 831 (1990).

**20.** *LeBlanc v. Sherwin Williams Co.,* 406 Mass. 888, 890–93, 551 N.E.2d 30 (1990); *see also Jefferson ex rel. Coren v. Cardoza,* 139 F.R.D. 561, 568 (D.Mass.1991) (following *LeBlanc* ).

**21.** *Haas v. Breton,* 377 Mass. 591, 387 N.E.2d 138 (1979).

**22.** *Police Comm'r v. Lewis,* 371 Mass. 332, 357 N.E.2d 305 (1976).

**23.** *Isakson v. Vincequere,* 33 Mass.App.Ct. 281, 598 N.E.2d 1140 (1992).

• claims by a homeowner against a fire insurer that refused to pay on the policy [24]

The holdings may not form a discernible pattern,[25] but they echo a consistent refrain: the Housing Court is "a court of limited jurisdiction"—primarily of landlord-tenant disputes and "health, safety and welfare" regulations—and its jurisdiction should not be expanded, as that would only serve to "dilute the expertise of that court and to delay the resolution of disputes properly before it." *Haas v. Breton*, 377 Mass. 591, 600–01, 387 N.E.2d 138 (1979); *accord Ryan v. Kehoe*, 408 Mass. 636, 639, 562 N.E.2d 831 (1990); *LeBlanc v. Sherwin Williams Co.*, 406 Mass. 888, 897, 551 N.E.2d 30 (1990); *Isakson v. Vincequere*, 33 Mass.App.Ct. 281, 284, 598 N.E.2d 1140 (1992); *Williams v. Attleboro Mut. Fire Ins. Co.*, 31 Mass.App.Ct. 521, 525, 581 N.E.2d 482 (1991); *City of Boston v. Kouns*, 22 Mass.App.Ct. 506, 511, 495 N.E.2d 317 (1986).

Upon exhaustive review of the statutory and decisional law, the Court concludes that the Housing Court does not have jurisdiction over the Massachusetts Civil Rights Act. Consequently, claims under the Massachusetts Civil Rights Act will not necessarily be precluded simply because they were not raised in a prior Housing Court action.

### c. Exception to the Exception

██ There is, however, an exception to the exception to claim preclusion, and it applies to this case. The exception to the exception is that finality trumps the validity of judgments. Although claim preclusion does not apply to claims that were postponed in the name of subject matter jurisdiction, a collateral court generally cannot question the jurisdiction of another court as to claims *actually decided.*

This principle is illustrated in a case with a familiar set of facts, *Possehl v. Ossino*, 28 Mass.App.Ct. 918, 547 N.E.2d 59 (1989) (rescript):

When Philip Ossino, the landlord, brought eviction proceedings against William J. Possehl, the tenant, the latter not only defended but fired back with counterclaims raising breach of implied warranty of habitability, breach of covenant of quiet enjoyment in violation of G.L. c. 186, § 14, violation of G.L. c. 186, § 15B, retaliatory eviction, and negligence. That action ended in a settlement, memorialized by the filing in the District Court of an agreement for judgment, whereby the landlord received possession and dropped his claim for some $700 in back rent and the various counterclaims were resolved in favor of the landlord.

*Id.* at 918, 547 N.E.2d 59. Nine months later, the tenant tried to bring a new negligence action against his landlord, but the Superior Court held that the earlier agreement for judgment precluded the complaint. *Id.* On appeal, the tenant argued that "the settlement of the negligence counterclaim in the District Court was a nullity as the court lacked subject matter jurisdiction to hear such a claim within a summary process proceeding." *Id.* The Appeals Court held to the contrary, citing *Harker v. City of Holyoke*, 390 Mass. 555, 457 N.E.2d 1115 (1983).

*Harker* is the leading case. The facts are as follows: The City of Holyoke was having trouble maintaining adequate water pressure for its citizens. Annoyed, one

---

**24.** *Williams v. Attleboro Mut. Fire Ins. Co.*, 31 Mass.App.Ct. 521, 581 N.E.2d 482 (1991).

**25.** How to harmonize *McElligott, Springfield Housing Authority, Worcester Heritage Society,* and *Patry* with the statute and the other cases is less than clear.

family sued the city in Housing Court claiming that the substandard water service constituted a tort and a breach of contract. The Housing Court conducted a trial. After trial, but before judgment, the family moved for voluntary dismissal on the ground that the Housing Court lacked subject matter jurisdiction. The Housing Court denied the motion and entered judgment for the city on the merits. The family did not appeal the judgment. Instead, the family brought a subsequent complaint in Superior Court, identical in all respects except for the addition of a claim under Massachusetts General Laws chapter 93A. The Superior Court held that the Housing Court judgment precluded relitigation of the dispute. On appeal, the family argued that the Housing Court lacked jurisdiction so the Superior Court should have decided the case on the merits. 390 Mass. at 555–56, 457 N.E.2d 1115.

The Supreme Judicial Court refused to employ the jurisdictional exception to claim preclusion: "[W]e unanimously hold that relitigation of the plaintiffs' claims is precluded regardless of whether the Housing Court had subject matter jurisdiction." *Id.* at 558, 457 N.E.2d 1115. The court considered two competing policies: (i) the validity of judgments, which includes the idea that parties cannot confer jurisdiction on a court, and (ii) the finality of judgments. *Id.* at 558–59, 457 N.E.2d 1115. The court concluded:

> This is not a case in which we should give precedence to the principle of validity of judgments over the principle of finality, because here the plaintiffs commenced their action in the Housing Court, had a full and fair trial, lost on the merits, and chose not to appeal. Thus, there is no unfairness to the plaintiffs in holding that, as to them, the Housing Court judgment is final. Furthermore, whether the Housing Court had subject matter jurisdiction is fairly debatable, so the assumption of jurisdiction by the Housing Court does not constitute a clear and serious disregard of a statutory allocation of power between courts.

*Id.* at 559, 457 N.E.2d 1115 (footnote omitted).

More interesting for this Court's purposes, the Supreme Judicial Court also precluded the family from raising its Chapter 93A claim in Superior Court even though the issue had never been raised in Housing Court. *Id.* at 561, 457 N.E.2d 1115 (citing *Fassas v. First Bank & Trust Co.*, 353 Mass. 628, 629, 233 N.E.2d 924 (1968)). The following discussion explains why.

### d. Dimension of "Claim"

Massachusetts has long employed a "transactional" test for defining the dimension of a claim: "The statement of a different form of liability is not a different cause of action, provided it grows out of the same transaction, act, or agreement, and seeks redress for the same wrong." *Mackintosh*, 285 Mass. at 596, 190 N.E. 38; *accord Brunson v. Wall*, 405 Mass. 446, 451 n. 9, 541 N.E.2d 338 (1989); *Fassas*, 353 Mass. at 629, 233 N.E.2d 924. Thus, this Court must focus on which *facts* supported the civil rights claim in federal court and whether those facts were addressed in Housing Court.

The simplest way for the Court to answer this question is to compare the date of the Davignons' counterclaims in Housing Court for emotional distress (June 1998) to the dates of the wrongful conduct alleged in the complaint in this Court (January to April 1998). Because the counterclaims in Housing Court were brought after all of the events that could have formed the basis for the jury's verdict in this Court, the logical deduction is that both actions depended on a common set of facts.

But the Court need not rely on logic alone because the defendants provide a detailed comparison showing that the Davignons used the same witnesses and evidence in federal court that they were prepared to use in Housing Court. Defs.' Mem. at 6–8. Accordingly, the Court holds that the agreement for judgment in Housing Court completely encompassed the facts presented in this Court on the questions of intentional infliction of emotional distress *and* violation of the Massachusetts Civil Rights Act.

The discussion above reveals two propositions: First, claim preclusion generally does not require parties to raise their claims under the Massachusetts Civil Rights Act in Housing Court because that court would lack jurisdiction. Second, the scope of the Housing Court's jurisdiction does not determine the preclusive effect of the claims it has *actually decided.* The dispositive inquiry in the case at bar, then, is whether the Davignons actually litigated their civil rights claim in Housing Court. In fact, they did.

### 3. Putting It Together

The agreement for judgment in Housing Court precludes the verdict in favor of Neal Davignon and Patricia Kelley against Karl Clemmey for intentional infliction of emotional distress and violation of the Massachusetts Civil Rights Act. In all other respects the verdict remains intact: The assault and battery verdict stands because it prescinds from a different nexus of facts than the intentional infliction of emotional distress and Massachusetts Civil Rights claims and because the jury expressly found that there was no overlap in the amounts awarded. "Defendants acknowledge that the minor plaintiffs were not parties to the Housing Court case and thus the settlement of that case has no effect on the children's claims in the present case." Defs.' Mem. at 4 n. 3. Furthermore, Dan Clemmey was not a party to the Housing Court litigation and no argument is made that he should benefit from the agreement for judgment.[26] The only defendant in this Court who can benefit from the agreement is Karl Clemmey.

And benefit he should. The Davignons voluntarily settled their claims in Housing Court against Karl Clemmey. Were this Court to allow the plaintiffs' claim to continue, we would have to turn a blind eye to considerations of fairness and the requirements of efficient judicial administration which dictate that an opposing party in a particular action as well as the court is entitled to be free from

---

**26.** Dan Clemmey would have a difficult time convincing the Court that the agreement for judgment in Housing Court released him from liability: "[A] plaintiff who signs a general release form does not discharge all potential joint tortfeasors who are not specifically mentioned in the release unless the plaintiff intended to do so." *Cram v. Town of Northbridge,* 410 Mass. 800, 804, 575 N.E.2d 747 (1991) (construing Mass. Gen. Laws ch. 231B, § 4). Dan Clemmey cannot rely on claim preclusion because he was not a party, or in privity with a party, to the prior action. *See Sarvis v. Boston Safe Deposit & Trust Co.,* 47 Mass.App.Ct. 86, 100, 711 N.E.2d 911, *review denied,* 430 Mass. 1106, 717 N.E.2d 1015 (1999). Nor can he rely on collateral estoppel (i.e., issue preclusion) because nothing was "actually litigated" in Housing Court. *See Shwachman v. Meagher,* 45 Mass.App.Ct. 428, 433, 699 N.E.2d 16 (1998). *See generally* Restatement (Second) of Judgments § 27 cmt. e; 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4443, at 385 (1981) ("[C]onsent judgments ordinarily support claim preclusion but not issue preclusion."); Sheldon R. Shapiro, Annotation, *Modern views of state courts as to whether consent judgment is entitled to res judicata or collateral estoppel effect,* 91 A.L.R.3d 1170 (1979) (similar).

continuing attempts to relitigate the same claim. This we will not do. Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.

In the present case, the plaintiffs have had their "day in court" against the defendant.

*Bagley v. Moxley*, 407 Mass. 633, 638–39, 555 N.E.2d 229 (1990) (internal quotation marks, citations, and alterations omitted).

## III. PLAINTIFFS' PETITION FOR ATTORNEYS' FEES AND COSTS

The law is clear that the Court should award attorneys' fees and costs in this and any other case involving a violation of the Massachusetts Civil Rights Act. The only question is how much.

### A. Legal Standard

The Massachusetts Civil Rights Act provides, in relevant part:

Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court.

Mass. Gen. Laws ch. 12, § 11I.

### 1. Federal Law Compared

By way of comparison, the federal Fees Act provides:

In any action or proceeding to enforce a provision of [the federal laws protecting civil rights], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

42 U.S.C. § 1988(b). The Massachusetts Civil Rights Act parallels the Fees Act except in two respects: (i) the award is mandatory and (ii) only a prevailing *plaintiff* is eligible for an award. Despite these dissimilarities, the Supreme Judicial Court of Massachusetts has noted that the Massachusetts Civil Rights Act should be construed, for the most part, consistent with the federal decisions construing the Fees Act. *E.g., Kadlick v. Dep't of Mental Health*, 431 Mass. 850, 852–53 nn. 7–8, 731 N.E.2d 495 (2000); *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 821–23, 473 N.E.2d 1128 (1985). *But see Bailey v. Shriberg*, 31 Mass.App.Ct. 277, 281–82, 576 N.E.2d 1377 (1991) (refusing to award attorneys' fees to prevailing *defendants* ).

This Court recently construed the fee-shifting provision in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), which states that "[a]ny person injured in his business or property . . . shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee." *See Sys. Mgt., Inc. v. Loiselle*, 154 F.Supp.2d 195 (D.Mass.), *appeal filed*, No. 01–1538 (1st Cir. Apr. 10, 2001). The Court began its analysis of RICO's fee-shifting provision by noting that the provision is identical to the Fees Act except in three respects: (i) the award is mandatory, (ii) only a prevailing *plaintiff* is eligible for an award, and (iii) the award must be in addition to treble damages. *Id.* at 199. Despite these dissimilarities, this Court construed RICO's fee-shifting provision, for the most part, consistent with the federal decisions construing the Fees Act.

Because the text of the Massachusetts Civil Rights Act is closest to the text of RICO's fee-shifting provision, and this Court generally has construed RICO's fee-shifting provision to be consistent with the federal decisions construing the Fees Act, the following discussion will rely on *System Management* to award attorneys' fees

pursuant to the Massachusetts Civil Rights Act.

## 2. Lodestar Calculation

■■■ To calculate a reasonable attorney's fee, the Court will begin with the number of hours listed in the contemporaneous billing records for each person who worked on the plaintiff's case.... [T]he Court will discount for excessive hours .... Once the Court determines the reasonable number of hours that each person worked on the plaintiff's case, the Court will sum the product of each person's hours multiplied by a reasonable hourly rate to achieve the lodestar figure. There is a "strong presumption" that the lodestar figure is "reasonable." Neither the amount of damages recovered nor the actual terms of the fee agreement between the plaintiff and his attorneys will be used to vary the lodestar figure.

A few words on the reasonable hourly rate are in order. Courts in the First Circuit traditionally have tinkered extensively with the fees awarded in civil rights cases. Although the tinkering—especially the distinction between core and non-core time—originally was an effort to use the Model Code factors to determine a reasonable hourly rate, such tinkering now should be considered solely a function of discretion rather than a definition of what is reasonable. That is because the lodestar calculation presumably captures the balance of all the Model Code factors; additional tinkering merely serves to double count some factors. To determine a reasonable hourly rate, *Blum* [v. *Stenson*, 465 U.S. 886, 895 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)] instructs the Court to find the prevailing hourly rate in Boston for persons with comparable skill, experience, and reputation as the persons who worked on the plaintiff's case. The

First Circuit has read *Blum* to mean that fee awards should reflect what an *average* person could fetch in the market for similar work. As the market rate is primarily a question of fact, *Blum* suggests a court should be agnostic about the rate that the market supplies. Furthermore, the text of the fee-shifting provision in RICO does not afford a court the discretion found in the text of the Fees Act. Accordingly, a court awarding fees in a RICO case should tie itself to the market's mast and resist the siren song of sentiment when determining a reasonable hourly rate.

*Id.* at 208–09 (citations and footnote omitted).

## 3. Costs

■■■ In addition to attorneys' fees, a prevailing plaintiff is entitled to "costs." The word "costs" in the Fees Act has the same meaning as the word "costs" in section 1920 of Title 28, *see id.* at 204, but the Fees Act also allows recovery of expenses customarily billed directly to the client and shown to have been incurred reasonably and necessarily, *id.* Accordingly, a fee award may account for an attorney's photocopying, travel, telephone calls, couriers, depositions, court filings, mailings, trial exhibits, and the like. *See id.* at 204, 211.

## 4. Fees for Other Causes of Action

■■ When a plaintiff brings a civil rights claim along with other causes of action, the question becomes whether a court should award attorneys' fees that might reflect time spent on those other causes of action. In this case, Neal Davignon and Patricia Kelley each were awarded $1,000,000 either for infliction of emotional distress or violation of the Massachusetts Civil Rights Act by both of the Clemmeys (although the Court now con-

cludes that the agreement for judgment in Housing Court precludes the verdict against Karl Clemmey); Neal Davignon was awarded $350,000 for an assault and battery by Karl Clemmey; and Amanda and Chelsea Davignon each were awarded $1,250,000 for infliction of emotional distress by both of the Clemmeys. Does the Davignons' success on their other causes of action diminish their entitlement to attorneys' fees under the Massachusetts Civil Rights Act?

 "If a prevailing party is successful on all (or substantially all) of her claims, and receives complete (or near-complete) relief, it goes without saying that reasonable fees should be paid for time productively spent, without any discount for limited success." *Coutin v. Young & Rubicam P.R., Inc.,* 124 F.3d 331, 339 (1st Cir.1997). In other words, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

Accordingly, it does not matter that the Davignons and their children enjoyed spectacular success on more than just their civil rights claims. They received complete relief and thus are entitled to *all* reasonable attorneys' fees.

### 5. Penalty for Improper Timekeeping

 As stated above, this Court begins the lodestar calculation by looking at the contemporaneous billing records for each person who worked on the plaintiff's case. "[T]he absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious

cases, disallowance." *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984), *cited with approval in Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 297 (1st Cir.2001).

What is a "substantial reduction"? Fifty percent is a favorite among judges in this neck of the woods. *See, e.g., Lipsett v. Blanco,* 975 F.2d 934, 944 (1st Cir.1992); *Wilson v. McClure,* 135 F.Supp.2d 66, 74 (D.Mass.2001); *Rolland v. Cellucci,* 106 F.Supp.2d 128, 135 (D.Mass.2000) (Neiman, Mag.).

### B. Award of Attorneys' Fees

Four groups of attorneys submitted billing records: (i) Leonard H. Kesten, along with other members of his law firm (collectively, "Kesten"); (ii) Michael Pizziferri ("Pizziferri"); (iii) Sol J. Cohen ("Cohen"); and (iv) John P. LeGrand ("LeGrand"). They request the following:

| REQUESTED AWARDS | | | |
|---|---|---|---|
| Attorney | Fees | Costs | Total |
| Kesten | $149,735.00 | $11,998.95 | $161,733.95 |
| Pizziferri | $ 7,000.00 | $ 7,774.39 | $ 14,774.39 |
| Cohen | $ 59,085.25 | $ 0.00 | $ 59,085.25 |
| LeGrand [27] | $ 78,520.75 | $ 0.00 | $ 78,520.75 |
| | | Total: | $314,114.34 |

Pls.' Mem. Exs. B, C, F; LeGrand Aff. ¶ 14.

### 1. Reasonable Hours

#### a. Leonard H. Kesten et al.

 Although Kesten only represented Patricia Kelley, he in fact acted as the lead attorney for all the plaintiffs at trial. He gave part of the opening statement, did most of the questioning and cross-examination of witnesses, and delivered the closing argument.

Kesten kept contemporaneous billing records. Pls.' Mem. Ex. E ¶ 2. Those rec-

---

**27.** LeGrand identified 448.69 hours of professional services but failed to specify an hourly rate. For purposes of this table, the Court

assumes a rate of $175.00/hour, which corresponds to the rate requested by Cohen.

ords, however, include hours billed before May 9, 2001, the date on which he first appeared on behalf of Patricia Kelley. *See* Docket No. 47. Before representing Patricia Kelley, Kesten represented some third-party defendants who were not involved in the trial. "Courts repeatedly have recognized that the award of attorney's fees is to the plaintiff, not the attorney representing the plaintiff." *Kadlick*, 431 Mass. at 856, 731 N.E.2d 495. Accordingly, none of the plaintiffs is entitled to attorneys' fees for Kesten's work before May 9, 2001.

 Rather than re-calculate Kesten's hours, the Court has annotated Kesten's bill to show which time entries will not be allowed. The time disallowed includes all time before May 9, 2001, time spent talking to the news media, and time spent after trial preparing for the Rule 16 motion brought by the third-party defendants.

**b. Michael Pizziferri**

 Pizziferri represented the plaintiffs in the criminal matters related to this case. He is one of the plaintiffs' counsel of record, but in fact he referred this case to Cohen, who in turn involved LeGrand. Pizziferri attended the trial and provided advice to Kesten, Cohen, and LeGrand throughout the nine days of trial.

Pizziferri did not keep contemporaneous billing records. Instead he submits a summary bill for "professional services" indicating that he worked 35.00 hours on this case. Pls.' Mem. Ex. I. Without contemporaneous billing records or a detailed description of services rendered, the Court is in a poor position to determine a reasonable attorney's fee. Given Pizziferri's modest request, however, which roughly corresponds to the time of the trial, the Court accepts the summary bill for 35.00 hours.

**c. Sol J. Cohen**

 Upon Pizziferri's referral, Cohen (along with LeGrand) represented all the plaintiffs throughout this litigation. Cohen did not keep contemporaneous billing records "[d]ue to the fact that this matter was taken on a contingent fee basis." *Id.* Ex. F ¶ 8. Nevertheless, Cohen has produced a seventeen-page bill for 337.63 hours of work. *Id.* Ex. G. That will not do. Because Cohen failed to keep contemporaneous billing records, the Court reduces his time by approximately fifty percent to 175.00 hours.

**d. John P. LeGrand**

 Like Cohen, LeGrand represented all the plaintiffs throughout this litigation. Like Cohen, LeGrand did not keep contemporaneous billing records. LeGrand Aff. ¶ 11. LeGrand gives three estimates for the time he spent on this case: (i) an initial calculation of 536.00 hours, *id.* ¶ 14, (ii) a reconstructed, thirty-three page bill for 448.69 hours, and (iii) a general estimate that he devoted seven full weeks to this case, *id.* ¶ 14. Because LeGrand failed to keep contemporaneous billing records, the Court reduces his time by approximately fifty percent to 250.00 hours.

**2. Reasonable Rates**

 The attorneys request the following rates:

| REQUESTED HOURLY RATES | |
| --- | --- |
| Leonard H. Kesten—partner | $300.00/hour |
| Michael Pizziferri—partner | $200.00/hour |
| Sol J. Cohen—partner | $175.00/hour |
| John P. LeGrand—partner | — |
| Andrea W. McCarthy—associate | $225.00/hour |
| Diedre Brennan Regan—associate | $225.00/hour |
| Karen Peters—paralegal | $100.00/hour |
| Randy Spencer—paralegal | $100.00/hour |

The First Circuit and this Court repeatedly have instructed attorneys seeking fee awards to provide evidence of the pre-

vailing hourly rates in Boston for persons with comparable skill, experience, and reputation. The only evidence the attorneys provide in this case is their own affidavits, which state in a conclusory fashion what they believe to be reasonable. The affidavits do not even hint as to why the proffered rates might be reasonable.

Absent any evidence, the Court is left to its discretion to determine a reasonable rate. In *Wilson v. McClure*, 135 F.Supp.2d 66, 71–72 & nn. 1–2 (D.Mass. 2001), this Court noted that other judges in this district have approved rates of $300.00/hour and higher, but this Court did not climb on that bandwagon. Instead, this Court approved an hourly rate of $250.00/hour for Harvey Schwartz, an outstanding attorney who happens to be on the losing side this time. In *System Management*, 154 F.Supp.2d at 210, this Court approved an hourly rate of $235.00/hour, which the Court found to be comparable to the average billing rates of the largest law firms in Boston.

Based on the average billing rates of the largest law firms in Boston and the Court's own experience with lawyers of comparable skill, experience, and reputation, the Court approves the following hourly rates:

### APPROVED HOURLY RATES

| | |
|---|---|
| Leonard H. Kesten—partner | $250.00/hour |
| Michael Pizziferri—partner | $200.00/hour |
| Sol J. Cohen—partner | $175.00/hour |
| John P. LeGrand—partner | $175.00/hour |
| Andrea W. McCarthy—associate | $150.00/hour |
| Diedre Brennan Regan—associate | $150.00/hour |
| Karen Peters—paralegal | $ 75.00/hour |
| Randy Spencer—paralegal | $ 75.00/hour |

As explained in *System Management*, 154 F.Supp.2d at 209 & n. 2, a court should not parse "core" time from "non-core" time and award different hourly rates for different tasks. "That is because the lodestar

28. 35.00 hours at $200.00/hour.

29. 175.00 hours at $175.00/hour.

calculation presumably captures the balance of all the Model Code factors; additional tinkering merely serves to double count some factors." *Id.* at 209.

### C. Award of Costs

 Kesten requests $11,998.95 in costs. Again, however, he includes expenses incurred before May 9, 2001, the date he appeared on behalf of Patricia Kelley. The Court has annotated Kesten's bill to show which expenses will not be allowed. Pizziferri requests $7,774.39 in costs for depositions, process servers, photocopies, subpoenas, filing fees, and the like. The Court approves Pizziferri's request for costs in full.

### D. Putting It Together

The Court approves the following attorneys' fees and costs:

| APPROVED AWARDS | | | |
|---|---|---|---|
| Attorney | Fees | Costs | Total |
| Pizziferri [28] | $ 7,000.00 | $ 7,774.39 | $ 14,774.39 |
| Cohen [29] | $ 30,625.00 | $ 0.00 | $ 30,625.00 |
| LeGrand [30] | $ 43,750.00 | $ 0.00 | $ 43,750.00 |

Using the annotated bill, Kesten may determine his fees and costs at approved hourly rates, less (i) all time recorded and expenses incurred before May 9, 2001, (ii) time spent talking to the news media, and (iii) time spent after trial preparing for the Rule 16 motion brought by the third-party defendants.

### IV. CONCLUSION

On September 13, 2001, for the reasons set forth above, the defendants' post-trial motion [Docket No. 99] was DENIED to the extent it sought judgment notwithstanding the verdict, a new trial, or remittitur. Today the defendants' motion is ALLOWED with respect to the verdict for

30. 250.00 hours at $175.00/hour.

Neal Davignon and Patricia Kelley against Karl D. Clemmey for intentional infliction of emotional distress and violation of the Massachusetts Civil Rights Act.

On September 13, 2001, for the reasons set forth above, the petitions for attorneys' fees and costs [Docket Nos. 100, 104] were GRANTED to the extent provided above. Karl D. Clemmey and Dan Clemmey shall pay Neal Davignon and Patricia Kelley attorneys' fees and costs to the extent provided above. The parties shall prepare a form of judgment reflecting this award.

## ORDER

The defendants' motion for reconsideration [Docket No. 123] is ALLOWED. The penultimate sentence of the Memorandum and Order of November 7, 2001 mistakenly ordered Karl D. Clemmey to pay attorneys' fees and costs. The penultimate sentence is hereby amended to read, in its entirety, "Dan Clemmey shall pay Neal Davignon and Patricia Kelley attorneys' fees and costs to the extent provided above."